**COMMONWEALTH OF The NORTH-ERN MARIANA ISLANDS, Plaintiff-Appellee.**

v.

**Mariano Faisao MENDIOLA, Defendant–Appellant.**

**No. 91–10093.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 15, 1992.

Decided Sept. 23, 1992.

As Amended Jan. 14, 1993.

Lecia M. Eason, Wiseman & Eason, Saipan, MP, for defendant-appellant.

Steven P. Pixley, Asst. Atty. Gen., Commonwealth of the Northern Mariana Islands, Saipan, MP, for plaintiff-appellee.

Before TANG, PREGERSON, and BOOCHEVER, Circuit Judges.

PREGERSON, Circuit Judge:

Mariano F. Mendiola was convicted by a jury in the trial court of the Commonwealth of the Northern Mariana Islands ("CNMI") for first degree murder, robbery,

kidnapping, and illegal possession of firearms. The Appellate Division of the United States District Court for the Northern Mariana Islands reversed the convictions and remanded to the trial court. Before the appellate division rendered its decision, however, the newly-created CNMI Supreme Court assumed jurisdiction over Mendiola's appeal and affirmed the convictions. Mendiola appeals.

On appeal, Mendiola contests the jurisdiction of the CNMI Supreme Court and raises several substantive errors. We hold that the CNMI Supreme Court had jurisdiction over Mendiola's appeal. On the merits, we hold that Mendiola's confessions, including those represented by the photographs, were involuntarily made based on the totality of the circumstances and that the confessions were therefore inadmissible. In particular, we note that Mendiola was not adequately apprised of his right to appointed counsel, if he could not afford one. Accordingly, we reverse Mendiola's convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 27, 1987, Galen Mack and Remedios Conley were robbed and fatally shot. Their bodies were discovered in the Obyan Beach area of Saipan in dense undergrowth known as the "boonies."

Police conducted an intensive investigation for over four months with no success. Then, Mario Reyes, a boyhood classmate of Mendiola's, informed law enforcement authorities that Mendiola had killed Mack and Conley. Reyes also admitted that he had been present during the murders but stated that he had not participated in the crimes. When Reyes implicated Mendiola, Reyes was incarcerated on other charges. Mendiola was also in custody on unrelated murder charges for which he was later acquitted. Both Reyes and Mendiola were confined in the same facility.

Reyes told police that three days after the murder he buried near his house the gun used to kill Mack and Conley. Later,

he told his brother to dig up the gun. When he went with police to retrieve the gun, it was not there. The appellate division found that there was evidence that the gun belonged to Reyes and that some of the stolen items were in Reyes' possession.

Reyes was never charged with any offense related to the Mack/Conley murders. At trial, he testified that Mendiola committed the charged offenses.[1]

Mendiola was interrogated on at least five occasions during March 17–19, 1988, regarding the Mack/Conley murders. The facts concerning the interrogations are not in dispute. At the first session, a Saipan police officer told Mendiola "he have [sic] a right not to talk to me—to talk to me, and he had a right to see a lawyer." At each subsequent session, Mendiola was given local statutory rights as well as *Miranda* rights in both English and Chamorro, his native language. Mendiola waived his rights each time before any police questioning began.

During the interrogations, the interrogating police officer wrote down in English each of the questions asked and each of Mendiola's responses. Mendiola was instructed to review the notes and to sign at the bottom of each page indicating that the notes were accurate. Mendiola complied, although his ability to read English is doubtful. Mendiola admitted killing Mack and Conley.

One of the interrogation sessions lasted five hours, but questioning stopped whenever Mendiola so requested. Mendiola was permitted to smoke and take coffee breaks.

Following the fifth session, Sergeant Camacho and Captain Castro of the Saipan Police Department took Mendiola to the location of the murders and instructed Mendiola to reenact the murders while they photographed him. He complied. Mendiola was finally arraigned in early April 1988. He had not been provided with counsel until this time.

It is uncontroverted that Mendiola is at least borderline mentally retarded. One psychologist, however, concluded that Men-

---

1. Reyes had also testified against Mendiola at Mendiola's other murder trial.

diola was indeed mentally retarded. His academic skills were at or below the first grade level and he dropped out of school after the sixth grade. Additionally, Mendiola's ability to read English is doubtful; apparently, he can read only a few simple English words.

At trial, the notes of the interrogation sessions, which Mendiola had signed, were admitted as "transcripts" of the sessions. Mendiola's attorney objected to the introduction of each statement. The record does not reflect that the trial court made a determination of voluntariness. The photographs of Mendiola reenacting the crime and the bloody, foul-smelling clothing of the victims were also admitted over the objections of Mendiola's attorney.

With the exception of the confessions and photographs, the only evidence against Mendiola is the testimony of the informer Reyes. There is no physical evidence linking Mendiola with the charged offenses.

Additionally, the murder weapon was never found. In closing argument, the prosecutor played on this fact by arguing to the jury that the community would be living in fear that Mendiola would come after them with the missing gun if he were acquitted. The jury found Mendiola guilty on all charges. Mendiola was sentenced to life in prison.

On September 29, 1988, Mendiola timely filed a notice of appeal to the Appellate Division of the district court for the Northern Mariana Islands ("appellate division"). At that time, the appellate division functioned as a three-judge appellate court, hearing cases from local trial courts deemed appealable by the CNMI legisla-

ture. While Mendiola's appeal was pending in the appellate division, the local legislation known as the Commonwealth Judicial Reorganization Act of 1989, Pub.L. 6–25, § 3109 ("Act"), became effective. The Act conferred appellate jurisdiction over judgments of the local trial court to a newly-created CNMI Supreme Court. It also purported to divest the appellate division of jurisdiction over all appeals pending before it on May 2, 1989, the effective date of the Act.[2] Pub.L. No. 6–25, § 3109(b).

On March 14, 1990, the CNMI Supreme Court ordered that all cases pending in the appellate division file a Notice of Appeal to the CNMI Supreme Court. The appellate division decided that it would be manifestly unjust to require Mendiola to refile his appeal with the CNMI Supreme Court and retained jurisdiction over his case. It vacated Mendiola's convictions on April 30, 1990, and remanded the case to the trial court. The final mandate issued on May 24, 1990. The appellate division ordered the trial court to conduct hearings on Mendiola's competency to stand trial[3] and on the voluntariness of his confessions. It further ordered the exclusion of the photographs and ordered that Mendiola was not to be interrogated in the absence of his attorney.

During pre-trial proceedings upon remand, the CNMI Supreme Court decided that the appellate division lacked jurisdiction after the enactment of Pub.L. 6–25 and issued a writ of prohibition directing the trial court to halt all proceedings in Mendiola's case. Mendiola's appeal was then heard by the CNMI Supreme Court in an expedited manner. His convictions were

---

**2.** An appeal is pending if "the final controlling mandate of the appellate tribunal having jurisdiction of the appeal has not been received by the Commonwealth Trial Court." Pub.L. 6–25, § 3109(c).

**3.** We note that upon remand from the appellate division, both the government and defense psychologists opined that Mendiola was incompetent to stand trial, yet the trial court adjudged him competent and ordered him arraigned on the original charges. We are troubled by this assertion. The conviction of an accused who is legally incompetent violates due process. *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838,

15 L.Ed.2d 815 (1966). A defendant is competent to stand trial if he has a rational and factual understanding of the proceedings and has sufficient present ability to consult with and assist counsel. *See Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975); *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Moreover, the defendant must be competent to stand trial at the time of the trial; a competency determination may not be based on out-of-date psychological evaluations. *See Dusky,* 362 U.S. at 403, 80 S.Ct. at 789.

affirmed on January 10, 1991. This timely appeal followed.[4]

Mendiola contends that a local legislature cannot divest the appellate division of jurisdiction over pending appeals. In the alternative, he argues that it would be manifestly unjust to apply Pub.L. 6–25 retroactively to his case. On the substantive issues, Mendiola contends that the administration of his *Miranda* rights was inadequate and that the trial court erred in admitting his "confessions" (written and photographic) in the absence of a voluntariness hearing. He also contends that the prosecutor's closing argument was unduly prejudicial.

## I. Jurisdiction

### A.

■ Under 48 U.S.C. § 1694b(a),[5] the jurisdiction of the appellate division is to be determined by CNMI law. CNMI Pub.L. 6–25 established the CNMI Supreme Court and conferred upon it jurisdiction over those cases previously appealable to the appellate division.

Mendiola contends that Pub.L. 6–25 cannot divest a federal court of jurisdiction over pending appeals. We addressed this issue in *CNMI v. Kawano*, 917 F.2d 379 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1116, 113 L.Ed.2d 224 (1991). In *Kawano*, an appeal from the appellate division to this court was filed after passage of the Act. We held that we lacked jurisdiction to hear the appeal. In reaching this conclusion, we first considered whether the appellate division had jurisdiction to hear the case. *Id.* at 380. After examining § 1694b(a) and Pub.L. 6–25, we concluded that the local statute had divested the appellate division of jurisdiction over the case. *Id.* at 381. *See also Mafnas v. United States District Court for the Northern Mariana Islands,* 919 F.2d 101, 102 (9th Cir.1990) (applying *Kawano* to civil case and holding that appellate division lost jurisdiction over all appeals for which its final mandate had not yet issued at the time the Act became effective). Accordingly, we could not assume jurisdiction.

Mendiola contends that *Kawano* is inapposite because we merely assumed, rather than decided, that CNMI had authority to divest the appellate division of jurisdiction over pending cases. We reject this contention. Implicit in our holding that the appellate division lacked jurisdiction over Kawano's appeal is the determination that CNMI was empowered through § 1694b(a) to withdraw jurisdiction over pending appeals from local trial courts.

Our decision in *Wabol v. Villacrusis,* 958 F.2d 1450 (9th Cir.1992) (as amended) is not to the contrary. In *Wabol*, we carefully distinguished between the jurisdictional basis of the appellate division and that of the Ninth Circuit and the U.S. Supreme Court. We held that CNMI could determine whether appeals from local trial courts were to be taken to a local appellate court or to a federal court, but that CNMI had no authority "to make such determinations relating to appeals from a federal court." *Id.* at 1457–58. We also addressed retroactive application of Pub.L. 6–25:

> [A]lthough the Act by its terms applies retroactively to appeals from local trial courts which were pending in the appellate division of the district court when it was passed [citation omitted], NMI is without power under the Covenant to divest this court of jurisdiction over appeals properly filed from a final order of the appellate division of the district court entered before the passage of the Act.

*Id.* at 1458.

As in *Kawano*, the appeal here was taken from a decision of a local court and the

---

**4.** Mendiola's appeal was filed on January 24, 1991, but was not date stamped until January 28, 1991. Under 9th Cir.R. 26–1, the deadline for filing appeals from the Northern Mariana Islands is extended by seven days.

**5.** Section 1694b(a) provides:

Prior to the establishment of an appellate court for the Northern Mariana Islands the [federal] district court shall have such appellate jurisdiction over the courts established by the Constitution or laws of the Northern Mariana Islands as the Constitution and laws of the Northern Mariana Islands provide, except that such Constitution and laws may not preclude the review of any judgment or order which involves the Constitution, treaties, or laws of the United States, including the [Covenant]....

mandate from the appellate division had not issued before the Act became operative. Moreover, we find no relevance in the fact that in *Kawano*, the appeal was filed after the Act became effective and in the present case, the appeal was filed before the effective date. Therefore, we conclude that the CNMI legislature had authority to divest the appellate division of jurisdiction over Mendiola's pending appeal. The appellate division's judgment is void for lack of jurisdiction.

But we are not without jurisdiction. For the first fifteen years after the creation of a local appellate court, the Ninth Circuit has jurisdiction over appeals from the highest CNMI court that involve federal issues. 48 U.S.C. § 1694c(a). The CNMI Supreme Court issued a final judgment affirming Mendiola's conviction; therefore, we have jurisdiction to hear Mendiola's appeal under 48 U.S.C. § 1694c(a).

### B.

As an alternative to his jurisdictional argument, Mendiola contends that the application of Pub.L. 6–25 to his appeal before the appellate division will result in manifest injustice. Ordinarily, a court is to apply the law in effect at the time it renders its decision, even when the law changes during the pendency of the appeal. *Bradley v. School Bd.*, 416 U.S. 696, 711, 715–16, 94 S.Ct. 2006, 2016, 2018–19, 40 L.Ed.2d 476 (1974); *Gioda v. Saipan Stevedoring Co.*, 855 F.2d 625, 630 (9th Cir. 1988). "[W]hen a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law...." *Bruner v. United States*, 343 U.S. 112, 116–17, 72 S.Ct. 581, 584, 96 L.Ed. 786 (1952). However, a new law will not be applied retroactively if its application will result in manifest injustice. *Bradley*, 416 U.S. at 716, 94 S.Ct. at 2018; *Gioda*, 855 F.2d at 630.

Mendiola has not, and will not, suffer manifest injustice from application of Pub.L. 6–25 to his case because the CNMI Supreme Court took jurisdiction over his appeal in an expedited manner when the appellate division was divested of jurisdiction. We rejected such a claim under similar circumstances in *Kawano*. *See Kawano*, 917 F.2d at 382. The sense of futility and waste from having to refile in another court "is insufficient to invoke the exception" to the general rule of applying the law in force at the time of decision. *Id.*

Mendiola further argues that to vacate the judgment of the appellate division will result in manifest injustice because the appellate division considered both local and federal issues whereas we may hear only federal issues. *See* 48 U.S.C. § 1694c(a). However, Mendiola's local issues were heard by the CNMI Supreme Court, a more appropriate court to determine issues of local law.

We also find Mendiola's reliance on *Gioda* misplaced. In *Gioda*, we held that an amendment to the jurisdictional statute could not divest the appellate division of jurisdiction over a pending appeal because to do so would have resulted in denial of an appellate forum altogether. *Gioda*, 855 F.2d at 630. Here, however, Mendiola was not deprived of his right to appeal. He was given the opportunity to appeal to the CNMI Supreme Court and ultimately to this court. *See* 48 U.S.C. § 1694c(a). We therefore conclude that Mendiola will not suffer manifest injustice by applying Pub.L. 6–25 to his case.

### II. Miranda Rights

We now turn to Mendiola's substantive challenges. Mendiola first contends that the method by which his *Miranda* rights were administered was affirmatively misleading and confusing in violation of the Fifth Amendment. He contends that his right to appointed counsel was obscured because his local statutory rights, which differed from *Miranda* rights, were administered first. Mendiola therefore argues that his confessions, including the photographs, should have been suppressed.

■ Preceding each interrogation session, the Saipan Police Department advised Mendiola of his local statutory rights, followed by his federal constitutional rights as defined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under 6 CMC § 6105, the following warning of "local rights" was given:

[Y]ou have a right to see at reasonable intervals, and for a reasonable time at the place of your detention, counsel, or members of your family, or your employer, or a representative of your employer. Do you understand? I am required by law to make a reasonable effort to send a message by telephone, cable, wireless, messenger or other faster means to a lawyer or counsel, member of your family, your employer or your employer's representative if you so request, if such message can be sent without expense to the government or your [sic] pay in advance any expense there may be to the government. Do you understand? You will be charged with a criminal offense or released within a reasonable time, which under no circumstances shall be more than 24 hours. Do you understand?

This warning was followed by the standard *Miranda* warnings, given in both English and Chamorro. Whether adequate *Miranda* warnings were given is a question of law we review de novo. *United States v. Connell,* 869 F.2d 1349, 1351 (9th Cir. 1989).

■ In *United States v. Noa,* 443 F.2d 144 (9th Cir.1971), we found that the following warning of *Miranda* rights survived constitutional scrutiny: "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you if you wish." *Id.* at 145. We found this language adequate to meet *Miranda* requirements even though it fails to explicitly inform defendants of the right

to *appointed* counsel before and during questioning. *Id.* at 146. In *United States v. Connell,* 869 F.2d 1349, 1351–52 (9th Cir.1989), expounding on *Noa,* we explained that this is so because an inference can reasonably be drawn from the warnings given in *Noa* that appointed counsel would be made available before and during questioning if the arrestee desired counsel and could not afford one. In *Connell,* we further stated: "We reject as fatally flawed, however, a version of the *Miranda* litany if the combination or wording of its warnings is in some way affirmatively misleading, making such an inference [of appointed counsel before and during questioning] less readily available." *Id.* at 1352.

On the facts of *Connell,* we found reversal warranted because the warnings given were insufficient to apprise the defendant of his right to appointed counsel before and during questioning. Connell was first told that he had the right to talk to an attorney before, during, and after questioning. This statement was followed by the assertion that such an attorney could not be obtained at the government's expense. Subsequent statements advised Connell of his right to appointed counsel if he could not afford one. *Connell,* 869 F.2d at 1352. We concluded that the warnings were equivocal and open to misinterpretation.[6] *Id. Cf. United States v. Garcia,* 431 F.2d 134 (9th Cir.1970) (per curiam) (warnings inadequate where suspect was told that she had a right to the presence of counsel when she answered any questions and was later told that she could obtain appointed counsel upon her first appearance before the U.S. Commissioner or the Court).

The circumstances of the present case are similar to those of *Connell.* Mendiola was first told that a lawyer or other person would be contacted if such contact could be effected at no cost to the government or if he could pay for the call in advance. Then, he was advised of his *Miranda* rights. Here, as in *Connell,* the warnings were

---

**6.** We note that in *Connell,* there was also a discrepancy between the oral and written warnings. The oral warnings stated that " 'a lawyer may be appointed to represent you' " and the written warnings stated that "if I want but cannot afford a lawyer 'arrangements will be made

for me to obtain a lawyer in accordance with the law.' " *Connell,* 869 F.2d at 1353. In addition, the court observed that the phrase "in accordance with the law" in the latter warnings was ambiguous. *Id.*

equivocal, contradicting, and open to misinterpretation. Mendiola's ability to draw the inference that he was entitled to *appointed* counsel before and during questioning was made more tenuous by the initial statement that a lawyer or other person would not be contacted unless it could be accomplished at no cost to the government. Because of this initial statement, it was not clear whether appointed counsel would be provided before questioning or at some future date.

We need not decide, however, whether this error alone renders Mendiola's confessions, including the photographs of Mendiola enacting the crime,[7] inadmissible because we conclude that the totality of the circumstances requires their suppression.

### III. Voluntariness of "Confessions"

#### A.

Mendiola argues that he was denied due process because his "confessions" (statements and photographs) were involuntary in light of his borderline mental retardation, his inability to read English, the inadequacy of his *Miranda* warnings, the absence of friends or family, the delay of three weeks before arraignment, and the absence of counsel for the entire period prior to arraignment. He further contends that the trial court's failure to sua sponte hold a hearing to determine the voluntariness of his confessions constitutes reversible error under *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

The prosecution, on the other hand, contends that the trial court is under no obligation to conduct a *Jackson v. Denno* hearing absent a motion to suppress the confessions or a specific objection to the introduction of the statements. It also suggests that the evidence presented at trial demonstrates that Mendiola's confessions were voluntary.

Under *Jackson v. Denno,* the trial court is required to make a full and independent determination of the voluntariness of the defendant's confessions. 378 U.S. at 390–94, 84 S.Ct. at 1788–90. The conclusion that the confession was voluntary must appear from the record "with unmistakable clarity."[8] *Sims v. Georgia,* 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967); *Wallace v. Hocker,* 441 F.2d 219, 221 (9th Cir.1971).

The prosecution argues that Mendiola's failure to make a pre-trial motion to suppress his confessions[9] or to object specifically to the introduction of his statements resulted in a waiver of his right to a *Jackson v. Denno* hearing. This Circuit has held that a *Jackson v. Denno* hearing is only required where a defendant objects to the admission of a confession on involuntariness grounds *or where there is evidence in the record tending to show such involuntariness. Jacobson v. California,* 431 F.2d 1017, 1018–19 (9th Cir.1970). There is ample showing in the record— bench conferences, defense counsel's opening argument, psychiatric reports, and extensive cross-examination of the officers regarding the circumstances of the confessions—to suggest that Mendiola's confes-

---

7. Mendiola urges us to treat the photographs of him enacting the crimes as confessions. Because they were taken as part of a series of interrogation sessions, we feel it is appropriate to do so. It is particularly fitting in light of the prosecutor's argument to the jury that the photographs were like "three thousand words here by Mr. Mendiola saying, 'I murdered Galen Mack and Remedios Conley.'"

8. The Eighth Circuit has held that the overruling of an objection to the admission of a confession is not a finding of voluntariness. *See Parker v. Sigler,* 413 F.2d 459, 462 (8th Cir.1969), *vacated*

*on other grounds,* 396 U.S. 482, 483, 90 S.Ct. 667, 668, 24 L.Ed.2d 672 (1970). The Supreme Court agreed with the Eighth Circuit, that a trial court's decision overruling an objection is not a finding of voluntariness. In vacating the Eighth Circuit's decision, the Court stated that "[w]e agree with the Court of Appeals that the record ... do[es] not justify a conclusion that the trial [court] made [its] own determination of voluntariness." 396 U.S. at 483, 90 S.Ct. at 668.

9. Rule 12(b)(3), Fed.R.Crim.P., provides that motions to suppress evidence must be made prior to trial.

sions were involuntary. In these circumstances, we find that the trial court committed plain error in failing to make any determination on the question of voluntariness. *See United States v. Bosch*, 951 F.2d 1546, 1548 (9th Cir.1991) (plain error automatically preserved for appellate review), *cert. denied,* —— U.S. ——, 112 S.Ct. 2975, 119 L.Ed.2d 594 (1992).

The prosecution's reliance on *United States v. Maher*, 645 F.2d 780 (9th Cir. 1981), to support its waiver argument is misplaced. In *Maher*, we held that the trial court did not commit reversible error by failing to hold a *Jackson v. Denno* hearing in the face of an untimely motion at the close of trial because no issue had been raised as to the voluntariness of Maher's statements. *Id.* at 783. As we noted, the issue of voluntariness had been raised neither by a pre-trial motion to suppress, by objections at trial, nor through cross-examination. Thus, there was no issue upon which to hold a hearing. *Id.* The present case differs from *Maher.* Though Mendiola did not make a pre-trial motion to suppress and his objections were on general grounds, the issue of voluntariness pervaded the trial and could not have been overlooked by the trial court.

We wish to clarify one additional point, however. The CNMI Supreme Court, in its opinion affirming Mendiola's convictions, noted that there are factual discrepancies regarding Mendiola's literacy. It stated that these factual questions are to be determined by the jury. *CNMI v. Mendiola*, No. 90–027, 1991 WL 70060, at *4 (N.Mar.I. Jan. 10, 1991). However, the United States Supreme Court in *Jackson* held that permitting the jury to determine voluntariness on the basis of disputed facts violated due process. *Jackson*, 378 U.S. at 389, 392, 395, 84 S.Ct. at 1789, 1791. The

trial court must first resolve evidentiary conflicts and determine that the confession was freely and voluntarily given before admitting it into evidence. *Sims*, 385 U.S. at 543–44, 87 S.Ct. at 642–43. The jury may then choose what weight to give the confession in determining the guilt or innocence of the defendant. *Id.* at 544, 87 S.Ct. at 643. This the trial court failed to do.

### B.

The prosecution has the burden of proving that the defendant's confessions were voluntary. *See Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *United States v. Crespo de Llano*, 838 F.2d 1006, 1015 (9th Cir.1988) (as amended). The voluntariness of a confession is determined by an examination of the totality of the circumstances. *Crespo de Llano*, 838 F.2d at 1015. We review a determination of voluntariness de novo. *United States v. Wolf*, 813 F.2d 970, 974 (9th Cir.1987).[10]

Title 18 U.S.C. § 3501(b) may serve as a starting point in determining the voluntariness of a confession.[11] Section 3501(b) provides that the following factors are to be considered in making this determination: (1) the time elapsed between arrest and arraignment; (2) the defendant's knowledge of the nature of the offenses for which he was suspected or charged; (3) whether the defendant was advised or knew that he was not required to make a statement and that any statement made could be used against him; (4) whether the defendant was advised of the right to the assistance of counsel; and (5) the presence or absence of counsel when questioned and when making the confession.

Mendiola was not arraigned until approximately three weeks after he con-

---

**10.** The CNMI Supreme Court analyzed the circumstances surrounding Mendiola's confessions and determined that they were voluntary. *CNMI v. Mendiola*, No. 90–027, 1991 WL 70060, at *3 (N.Mar.I. Jan. 10, 1991). Thus, our decision *to review that determination is in keeping* with the rule that a determination on the voluntariness of a confession is to be made in the first instance by a state court. *See Sigler*, 396 U.S. at 484, 90 S.Ct. at 669 (holding that a federal court which finds a *Jackson v. Denno* error in a state proceeding must allow the State a reasonable time to make an error-free determination on the

voluntariness of the confession); *Sims*, 385 U.S. at 544 n. 2, 87 S.Ct. at 643 n. 2 (noting that a determination of voluntariness should be made initially in the state court before the case is considered by federal courts on direct review or on a petition for habeas).

**11.** The test for reviewing a determination of voluntariness under 18 U.S.C. § 3501 is probably the same as the standard for reviewing a determination of voluntariness under a due process analysis. *United States v. Wilson*, 838 F.2d 1081, 1086 (9th Cir.1988).

fessed, and he did not see an attorney until his arraignment. We have held that an unreasonable delay between arrest and arraignment of even a few hours weighs heavily toward a finding of involuntariness when the purpose of the delay is to obtain a confession. *United States v. Wilson*, 838 F.2d 1081, 1085–86 (9th Cir.1988). The reason for the prolonged delay here is not known, but we note that within the first few days of questioning, the police were able to extract several confessions and photographs of Mendiola enacting the crimes for which he was charged. Mendiola's delayed arraignment postponed the intervention of an attorney on his behalf and kept him under the psychological pressure of not understanding his situation. Additionally, because Mendiola was not charged with the Mack/Conley murders until April, it is unclear whether he knew he was facing the serious charges of murder, robbery, and kidnapping.

As discussed above, *Miranda* rights were administered to Mendiola in a manner that was confusing and affirmatively misleading. His mental retardation and illiteracy are also factors to be considered in determining the voluntariness of his confessions. *See, e.g., Reck v. Pate*, 367 U.S. 433, 441, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961) (low intelligence); *Payne v. Arkansas*, 356 U.S. 560, 562, 567, 78 S.Ct. 844, 847, 850, 2 L.Ed.2d 975 (1958) (lack of education and low intelligence). Mendiola's condition rendered him vulnerable to the suggestions of police, who instructed Mendiola to read the statements (written in a language Mendiola could not understand) and to sign the bottom of each page to indicate accuracy. Moreover, the "transcripts" of Mendiola's confessions were not transcripts at all; they were merely notes taken by the interrogating officers. *NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427, 1436 (9th Cir.1991) ("it is preferable to record prior out-of-court statements in a language which the declarant can read if the declarant is asked to sign the statement").

Consideration of Mendiola's reduced mental capacity is critical because it rendered him more susceptible to subtle forms of coercion. The psychological report by Dr. E. Woodyard, Ph.D., demonstrates that Mendiola was subjected to psychological coercion to which he was particularly sensitive.[12] Based on an interview with Mendiola, Dr. Woodyard concluded that he had been traumatized by the interrogations and was bewildered about his situation. According to Dr. Woodyard's report, Mendiola was intimidated by the two officers, one of whom stood behind him during the questioning. He consistently denied participating in the crimes and was upset by accusations that he was lying.

Relying on *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 525, 93 L.Ed.2d 473 (1986), the prosecution asserts that police misconduct is a prerequisite to a finding that a confession is involuntary. The prosecution contends that no police misconduct occurred in Mendiola's case.

However, psychological coercion can constitute police misconduct. *Id.* at 164, 107 S.Ct. at 520. As the Court in *Connelly* observed, "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Id.* In *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 279–80, 4 L.Ed.2d 242 (1960), the Supreme Court recognized that "coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." It acknowledged that physical coercion can be matched by "more sophisticated modes of 'persuasion,'" noting that "[a] prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror." *Id.*

The methods used to extract confessions from Mendiola are a type of subtle coercion that can have an extraordinary effect on one of low mental capabilities. Police repeatedly informed Mendiola that he would be charged or released within 24 hours, they interrogated him on numerous occasions without affording him the comfort of

---

**12.** The trial court excised those portions of Dr. Woodyard's report that contained statements by Mendiola denying involvement in the crimes and describing his interrogation.

friends, family, employer, or attorney, they repeatedly accused him of lying, and they instructed him to sign statements he could not understand. We find it highly likely that Mendiola's will was overborne, making his confessions the product of coercion. Accordingly, in view of the apparent involuntariness of Mendiola's statements, improper police tactics, and faulty *Miranda* warnings, we conclude that Mendiola's confessions should have been suppressed.

■ We recognize that under *Arizona v. Fulminante*, — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the harmless error doctrine applies to coerced confessions. In *Fulminante*, the Supreme Court stated that harmless error analysis is appropriate for errors "which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante* at —, 111 S.Ct. at 1264. We see no way for the prosecution to prove that the admission of Mendiola's confessions was harmless beyond a reasonable doubt. Without the confessions and photographs, the only evidence against Mendiola is the uncorroborated testimony of the informant, Reyes. *See id.* at —, 111 S.Ct. at 1258 (state failed to meet burden of proving error harmless beyond a reasonable doubt because physical and circumstantial evidence alone not sufficient to convict).

## IV. Prosecutorial Misconduct

■ Mendiola contends that the closing argument by the prosecutor was calculated to inflame the passions and fears of the jury. Because this issue may arise upon retrial, we address his contention.

■ It is well established that misconduct by a prosecuting attorney during closing argument may be grounds for reversal. *See Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not necessarily to win, but to do justice. *See Berger*, 295 U.S. at 88, 55 S.Ct. at 633. It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial. The prosecuting attorney may "prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* Because the members of the jury have confidence that a prosecuting attorney will abide by these obligations, inappropriate comments and suggestions may improperly influence the jury against the defendant. *Id.*

■ In closing argument, the prosecutor stated:

> Now as I said, a lot of people are interested in your decision.... Everyone in Saipan is interested. That's why there are so many people in the courtroom. The people want to know if they are going to be forced to live with a murderer.

> \* \* \* \* \* \*

> Your job is to worry about Mr. Mendiola. And when I say worry, I mean worry. Because that gun is still out there.

> \* \* \* \* \* \*

> Mr. Mendiola deserves to be punished for what he did and that's your decision. And it's important because, as I said, that gun is still out there. If you say not guilty, he walks out right out the door, right behind you.

These comments were plainly designed to appeal to the passions, fears, and vulnerabilities of the jury. They are a far cry from a few unwise comments within the context of a record otherwise unblemished by prejudicial errors. The prosecutor's comments came after the jury had already been exposed to the doubtful confessions

and photographs of Mendiola and the bloody clothes of the victims. Certainly, the comments were intended to induce a level of fear in the jurors so as to guarantee a guilty verdict.

■■■ We review improper prosecutorial remarks for harmless error. *See* Fed. R.Crim.P. 52(a). The applicable standard for harmless error in this context is whether it is more probable than not that the misconduct affected the jury's verdict. *United States v. Flake,* 746 F.2d 535, 541 (9th Cir.1984), *cert. denied,* 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985). While commentary on a defendant's future dangerousness may be proper in the context of sentencing, it is highly improper during the guilt phase of a trial. The prosecutor's suggestions that Mendiola would walk out of the courtroom right behind them, if acquitted, and presumably retrieve the missing murder weapon was particularly improper because the prosecutor knew that his witness, the informer Reyes, was responsible for the missing gun.

Additionally, the case against Mendiola was not strong. Absent the confessions and photographs of Mendiola, which were coerced and therefore unreliable, the only evidence against Mendiola was the testimony of Reyes, a witness with an established criminal history. There was no physical evidence linking Mendiola to the crimes. Under such circumstances, prejudice against Mendiola's case due to the improper argument of the prosecuting attorney was highly probable. *See Berger,* 295 U.S. at 88–89, 55 S.Ct. at 633 (when case is not strong, prejudice is highly probable); *cf. United States v. Monaghan,* 741 F.2d 1434, 1443 (D.C.Cir.1984), (improper remarks not reversible error because evidence was overwhelming), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985).

A prosecutor's use of illegitimate means to obtain a verdict brings his office and our system of justice into disrepute.

* The names of the real-party-in-interest/appellee and his guardians have been omitted from this opinion. The clerk is directed to conform the

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.