**STATE of North Dakota, Plaintiff and Appellee**

v.

**Lanny M. VanNATTA, Defendant and Appellant.**

**Cr. No. 920309.**

Supreme Court of North Dakota.

Sept. 8, 1993.

John E. Greenwood, State's Atty., James-
town, for plaintiff and appellee.

William A. Mackenzie, Jamestown, for defendant and appellant.

SANDSTROM, Justice.

Lanny M. VanNatta appeals from a murder conviction and from an order denying his motion for a new trial. We affirm.

## I

VanNatta was charged with murder, a class AA felony under Section 12.1–16–01(1)(a) and (b), N.D.C.C., for the March 1991 death of Iona Ostlund. VanNatta's court-appointed counsel raised the issue of VanNatta's competency to stand trial and filed a notice of defense based on mental condition under Rule 12.2(a), N.D.R.Crim.P. The trial court ultimately appointed three doctors and a criminal trial lawyer to examine VanNatta and render an opinion about his competency to stand trial. After a hearing, the court found that VanNatta was competent to stand trial. Thereafter, the court denied VanNatta's motion to suppress statements made by him and physical evidence seized from his apartment.

Under Section 12.1–04.1–16, N.D.C.C., VanNatta demanded a bifurcated trial on whether he committed the offense and on whether he was criminally responsible for his conduct. In the first phase of the trial, a jury found that VanNatta committed the offense, and, in the second phase, the jury found that he was criminally responsible. VanNatta moved for a new trial on the ground of newly discovered evidence. The trial court denied VanNatta's motion, and he appeals from the judgment of conviction and from the order denying his motion for a new trial.

## II

■ VanNatta argues the trial court clearly erred in determining that he was competent to stand trial.

■ It is well established that due process prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Medina v. California*, 505 U.S. ——, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Heger*, 326 N.W.2d 855 (N.D.1982). *See also Godinez v. Moran*, —— U.S. ——, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

Section 12.1–04–04, N.D.C.C., outlines our standard for determining competency to stand trial:

> "*Disposition of mentally unfit defendants.* No person who, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures."

That statute is identical to Section 4.04 of the American Law Institute,. Model Penal Code, and sets forth the generally accepted standard for determining competency to stand trial. ALI–Model Penal Code, § 4.04, Explanatory Note. Under that standard, a defendant is not competent to stand trial if the defendant neither has sufficient present ability to consult with a lawyer with a reasonable degree of rational understanding, nor a rational as well as a factual understanding of the proceedings. *Heger* at 857; *see Drope v. Missouri, supra; Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

■ The prosecution must show by a preponderance of evidence that a defendant is competent to stand trial. *Heger* at 858. *Compare Medina*, 505 U.S. at ——, 112 S.Ct. at 2580–81, 120 L.Ed.2d at 367 [California statute requiring defendant to bear burden of proving incompetence to stand trial by a preponderance of evidence does not violate due process]. We review a trial court's determination on the issue of competency to stand trial under the "clearly erroneous" standard. *Heger* at 858. A finding of fact is clearly erroneous if there is no evidence to support it, or if, although there is some evidence to support it, a reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *E.g., Swanston v. Swanston,* 502 N.W.2d 506, 508–09 (N.D.1993).

Although not determinative, some courts have considered the level of a defendant's intelligence quotient (I.Q.) as one factor for a trial court to consider in assessing competency to stand trial. Annot., *Competency to Stand Trial of Criminal Defendant Diagnosed as "Mentally Retarded"*, 23 A.L.R. 4th 493 (1983). Another authority has identified the following non-exclusive factors for consideration by a trial court:

"(1) That the defendant has sufficient mental capacity to appreciate his presence in relation to time, place, and things; (2) That his elementary mental processes are such that he understands that he is in a court of law charged with a criminal offense; (3) That he realizes there is a judge on the bench; (4) That he understands that there is a prosecutor present who will try to convict him of a criminal charge; (5) That he has a lawyer who will undertake to defend him against the charge; (6) That he knows that he will be expected to tell his lawyer all he knows or remembers about the events involved in the alleged crime; (7) That he understands that there will be a jury present to pass upon evidence in determining his guilt or innocence; (8) That he has sufficient memory to relate answers to questions posed to him; (9) That he has established rapport with his lawyer; (10) That he can follow the testimony reasonably well; (11) That he has the ability to meet stresses without his rationality or judgment breaking down; (12) That he has at least minimal contact with reality; (13) That he has the minimum intelligence necessary to grasp the events taking place; (14) That he can confer coherently with some appreciation of proceedings; (15) That he can both give and receive advice from his attorneys; (16) That he can divulge facts without paranoid distress; (17) That he can decide upon a plea; (18) That he can testify, if necessary; (19) That he can make simple decisions; and (20) That he has a desire for justice rather than undeserved punishment."

*State v. Guatney*, 207 Neb. 501, 299 N.W.2d 538, 545 (1980) [Krivosha, Chief Justice, concurring].

In this case, the trial court initially appointed Dr. David Sharbo, a psychiatrist, to examine VanNatta. Dr. Sharbo noted that VanNatta had a "normal" I.Q. with a "well-substantiated and well-documented history of chronic mental illness." Dr. Sharbo recognized that VanNatta had a propensity to tell "tall tales" along grandiose themes, but, if challenged, he would acknowledge that the tale was not true. Dr. Sharbo indicated that, when questioned about Ostlund's death, VanNatta "was able to be evasive and represent his own self-interest by not divulging any information that might be harmful to him or to the defense of his case.... He was inconsistent in reporting different versions of what happened at various times, but he was consistently protective of his own involvement." Dr. Sharbo reported that VanNatta demonstrated a realistic working knowledge of the legal system and the roles of the various individuals involved in a criminal trial and that he was well informed about the charges pending against him and the potential penalties. Dr. Sharbo concluded that VanNatta had the capacity to understand the proceedings against him and that he was presently able to assist in his own defense, but suggested that his attorney use

"a straightforward approach to discussions with him and gentle confrontation when responses are inappropriate or questionable. This capacity will need to be reconsidered on an ongoing basis as the defense proceeds, and is subject to change if his mental condition deteriorates."

The parties then stipulated to the appointment of Dr. Michael Schmidt, a clinical psychologist, to examine VanNatta. Dr. Schmidt reported that VanNatta had a "mid average IQ" and a "good knowledge of the basics of legal proceedings." However, Dr. Schmidt noted that VanNatta had "serious problems ... in reality testing" and "serious impairment in perception and judgment; he fails to understand the world around him and how to get along in it." Dr. Schmidt stated that VanNatta's delusional and grandiose beliefs were consistent with "frontal lobe organic syndrome." Dr. Schmidt concluded that VanNatta "clearly understands the nature of the proceedings against him," but that he could not "participate effectively in his de-

fense" because of his "substantially impaired perception and judgment, in addition to specific delusional beliefs." Dr. Schmidt explained that VanNatta understood the factual meaning of an oath, but, because of his delusions, he could not comply with the oath. Dr. Schmidt warned that if VanNatta testified at trial, he would present "unreal, grandiose beliefs that could result in his being seen in a negative light."

After receiving Dr. Schmidt's report, the trial court ordered an examination at the North Dakota State Hospital to determine whether VanNatta "lacks capacity to understand the proceedings against him or to assist in his own defense" and whether he "is unable to effectively communicate with counsel." Pursuant to that order, Dr. Karl Ulrich, a psychiatrist at the State Hospital, evaluated VanNatta. Dr. Ulrich recognized that VanNatta had frontal lobe damage and diagnosed a "delusional disorder, grandiose type." Dr. Ulrich reported that VanNatta suffered from a disorder "of pseudologia fantastica ... akin to pathologic lying," and that, when confronted with a misstatement of fact, he would generally be able to recant. Dr. Ulrich noted that VanNatta "is aware of the charges against him and is motivated to help himself in the legal process. He appears able to plan legal strategies and to challenge prosecution findings and witnesses." Dr. Ulrich concluded:

"C. Despite his fixed delusional beliefs, Mr. Van Natta has the capacity to understand the proceedings against him and he is able to assist in his own defense as demonstrated by his verbalizations and his performance on the competency screening test.

"D. Mr. Van Natta is able to effectively communicate with his counsel but it will be important for his attorney to challenge Mr. Van Natta's tendency to involve himself in grandiose ideas and beliefs.

"E. I believe that Mr. Van Natta is currently fit to proceed and to effectively, albeit not optimally, communicate with his counsel. I do not believe that further hospitalization, involvement in psychotherapy or change of medication regimen would improve his ability to more effectively communicate with legal counsel."

The court then appointed Ralph Vinje, a criminal trial attorney, to examine VanNatta and render an opinion on his competency. Vinje testified that VanNatta understood the proceedings against him, but that he was unable to assist in his own defense. Vinje concluded:

"I don't believe that he is able to adequately differentiate between the real world and his fantasy world.

"He is a difficult individual to attempt to analyze based on the information that I have and the interviews I have had with him.

"I believe that the only way one could reach a firm belief as to Mr. VanNatta's grip on reality, and therefore his ability to assist in his own defense, is by constant and prolonged contact.

\*      \*      \*      \*      \*      \*

"I find that I must ... defer to the individual who has had the opportunity to question the subject and observe his demeanor, and allow Mr. Mackenzie's opinion to bolster my own in reaching the conclusion that from a legal prospective Mr. VanNatta is not able to assist his attorney in providing an adequate defense."

The trial court found VanNatta suffered from fixed delusions which were unrelated to Ostlund's death and that, separate from his fixed delusions, he had a "pattern of telling 'tall tales'" which he would admit were not true when challenged. The court found that VanNatta could "distinguish truth from untruth" and was able to effectively communicate with counsel and assist in his own defense.

VanNatta argues the trial court's finding that he was able to assist in his own defense is clearly erroneous, because his mental condition precluded him from consulting with his attorney with a reasonable degree of rational understanding. VanNatta asserts that Dr. Schmidt's expert opinion indicated that he was unable to assist in his own defense, because he could not give a consistent rendition of the facts and would have trouble

complying with the oath, which could result in a lack of credibility. VanNatta argues that Dr. Schmidt is the "real expert" and that greater reliance must be given to his opinion, because he is the "most qualified" expert and "did the more thorough job of conducting the testing, reviewing the records, [and] analyzing the circumstances and facts of the case."

The experts agreed VanNatta had a factual understanding of the legal system and of the role of each of the participants in the system. However, the experts disagreed about whether VanNatta could consult with his attorney with a reasonable degree of rational understanding. That dispute centers on VanNatta's judgment and his ability to distinguish between reality and fantasy in providing counsel, or a jury, with a consistent rendition of the facts.

■ The extent of VanNatta's ultimate success in defending himself is not the standard for determining his competency to stand trial. Competency to stand trial does not necessarily require that, if the defendant chooses to testify, the defendant must present perfectly consistent testimony or be a convincing liar. *See United States v. Nobles,* 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975) [Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; a defendant cannot use the Sixth Amendment as a justification for presenting the half-truth]. *Cf. Michigan v. Harvey,* 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) [after defendant invokes right to counsel, prosecution may not use defendant's responses to police initiated questioning as part of case-in-chief, but prosecution may use those responses to impeach defendant's trial testimony because a defendant who exercises the right to testify assumes a reciprocal obligation to testify truthfully and accurately]. Instead, the essence of the ability to consult with an attorney with a reasonable degree of rational understanding is that the defendant must be able to confer coherently with counsel and provide necessary and relevant information to formulate a defense. Note, *Incompetency to Stand Trial,* 81 Harv.L.Rev. 454, 457–459 (1967).

In this case, there was evidence that VanNatta had a "normal" or "mid average" I.Q. and a basic understanding of the legal process and the role of each of the participants in the proceedings. There was conflicting evidence about whether VanNatta was able to communicate with counsel with a reasonable degree of rational understanding so as to assist his counsel in formulating a defense. The trial court was in the best position to weigh that conflicting evidence. *Heger* at 861. Although VanNatta undoubtedly has some mental deficiencies, the presence of a mental illness does not equate with incompetency to stand trial. Competency to stand trial is "not something a person wears like a coat," *Heger* at 861, and we are not left with a definite and firm conviction that the trial court made a mistake in weighing the conflicting evidence and finding that VanNatta could effectively communicate with counsel to assist in his defense. The trial court's finding that VanNatta was competent to stand trial is not clearly erroneous.

### III

■ VanNatta argues the trial court erred in denying his motion to suppress statements that he made to the police and physical evidence that the police subsequently seized from his apartment.

After Ostlund's body was discovered in the stairway of the apartment building where VanNatta lived, the police interviewed the tenants of that building, including VanNatta, to gather information about her death. At the suppression hearing, VanNatta testified that he "basically invited the police" into his apartment for questioning. The police testified that VanNatta seemed "uptight," "nervous," and "restless," and that, after they informed him of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he indicated that he understood those rights and would talk. Although VanNatta consistently denied any responsibility for Ostlund's death, he thereafter made contradictory and incriminating statements and consented to the seizure of two plastic garbage bags containing clothing belonging to Ostlund. VanNatta was then taken to the Jamestown Law Enforcement Cen-

ter where the police recorded a second statement by him. Based on VanNatta's statements, the contents of the plastic garbage bags, and police observations while in his apartment, the police obtained search warrants for his apartment on March 29 and on April 5, 1991, and thereafter seized additional evidence.

VanNatta moved to suppress his statements and the physical evidence, contending that his statements were involuntary and that the subsequent seizures were unlawful. The court denied VanNatta's motion.

On appeal, VanNatta argues that because of his mental condition and the police's coercive conduct, his statements were involuntary and the subsequent seizure of physical evidence was unlawful. The validity of the subsequent seizure of the physical evidence depends on the voluntariness of VanNatta's statements, and our analysis focuses on the voluntariness issue.

■ In *State v. Taillon*, 470 N.W.2d 226, 228 (N.D.1991), we recently summarized the law of voluntariness:

"'A confession is voluntary if it is the product of the defendant's free choice rather than the product of coercion.... Voluntariness is determined by examining the totality of the circumstances surrounding the confession.... The inquiry focuses on two elements: (1) the characteristics and condition of the accused at the time of the confession and (2) the details of the setting in which the confession was obtained.... No one factor is determinative....'

'A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given....'" [Citations omitted].

We give deference to the trial court's determination on voluntariness, and we will not reverse that determination unless, after resolving evidentiary conflicts in favor of the trial court's determination, it is contrary to the manifest weight of the evidence. *Taillon* at 228.

In this case, the suppression hearing was after the competency hearing, and VanNatta asked the court to take judicial notice of the mental evaluations introduced at the compe-

tency hearing. The trial court was thus fully aware of VanNatta's mental condition. At the suppression hearing, the police testified that VanNatta was "coherent" and that he knew the gravity of the situation. The police further testified that they did not use coercion, force, or threats against VanNatta and that the questioning was "quiet," "calm," and "gentle." The police also testified that VanNatta seemed to understand the questions and that he did nothing "bizarre and off the wall." After a careful review of the record, we cannot say that, under the totality of the circumstances, the trial court's determination that VanNatta's statements were voluntary is manifestly against the weight of the evidence. Accordingly, we conclude that the trial court did not err in denying VanNatta's suppression motion.

IV

■ VanNatta argues the trial court abused its discretion in denying his motion for a mistrial and for a new trial.

At the first phase of the trial, the prosecution called Doug Wanzek as a witness. Wanzek lived in the apartment building where Ostlund's body was found. Wanzek testified that he observed VanNatta, Ostlund, and a third person on the ground floor of the apartment building about a week before Ostlund's death and that VanNatta and Ostlund were having a "forceful argument" with VanNatta making "sexual advances" to Ostlund. Wanzek testified that VanNatta said "one way or another I'm going to get her."

According to VanNatta, Wanzek's trial testimony about the presence of a third person and about VanNatta's threat against Ostlund constituted unfair surprise. VanNatta asserts that testimony was "markedly different from his prior statement and was very damaging" because it introduced aggressive behavior by him as an adult. VanNatta moved for a mistrial on the ground of unfair surprise. The court granted VanNatta a continuance to locate the third person.

■ A continuance is the proper remedy when a party asserts that the introduction of evidence constitutes unfair surprise. *State v. Gross*, 351 N.W.2d 428 (N.D.1984); Rule 403,

N.D.R.Ev., Explanatory Note. *See State v. Kunkel,* 452 N.W.2d 337 (N.D.1990). In *Kunkel,* we held that a trial court abused its discretion in not granting a continuance when a "key" witness changed his testimony. In this case, the trial court granted a continuance and did not abuse its discretion in refusing to grant a mistrial.

Although Wanzek was able to identify an individual who he believed was the third person present during the argument, that person was not called to testify at trial. After trial, VanNatta discovered that the person identified by Wanzek could not have been in the apartment building because he was in jail when Wanzek claimed the argument occurred. VanNatta then moved for a new trial on the ground of newly discovered evidence. The trial court denied his motion, concluding that the newly discovered evidence was not material and that it would not have resulted in an acquittal.

VanNatta argues the trial court erred in not granting him a new trial because the newly discovered evidence would have allowed him to successfully impeach Wanzek's testimony about aggressive behavior as an adult.

■■■■ To prevail on a motion for a new trial on the ground of newly discovered evidence, the defendant must show (1) the evidence was discovered after trial, (2) the failure to learn about the evidence at the time of trial was not the result of the defendant's lack of diligence, (3) the newly discovered evidence is material to the issues at trial, and (4) the weight and quality of the newly discovered evidence would likely result in an acquittal. *State v. Kopp,* 419 N.W.2d 169 (N.D.1988). *See* Rule 33, N.D.R.Crim.P., Explanatory Note. A motion for a new trial because of newly discovered evidence rests in the discretion of the trial court, and we will not reverse a trial court's denial of a motion for a new trial unless the court abused its discretion. *State v. Garcia,* 462 N.W.2d 123 (N.D.1990).

■■■ In this case, the newly discovered evidence does not bear directly on any of the elements of the offense, but may have provided a basis for impeaching Wanzek. General-

ly, purely impeaching affidavits are insufficient grounds to grant a new trial. *State v. McLain,* 312 N.W.2d 343 (N.D.1981). Also, given the evidence introduced at trial, an issue we will discuss later, we agree with the trial court that the newly discovered evidence would not likely have resulted in an acquittal. The trial court did not abuse its discretion in denying VanNatta's motion for a new trial.

V

■■■ VanNatta argues the trial court erred in allowing the prosecution to call his father as a rebuttal witness.

At trial, VanNatta's mother testified on his behalf. On cross-examination, she denied recollection of events and circumstances which led to VanNatta's commitment at the State Hospital as a youth. After the defense rested, the prosecution called VanNatta's father to rebut the mother's testimony. The trial court ruled the testimony by VanNatta's mother opened the door and allowed VanNatta's father to testify about the circumstances leading to VanNatta's commitment at the State Hospital as a youth.

■■■ A court has discretion to control the introduction of evidence at trial. *Williams County Social Services Board v. Falcon,* 367 N.W.2d 170 (N.D.1985); *State v. Skjonsby,* 319 N.W.2d 764 (N.D.1982). We agree with the trial court that VanNatta's mother's testimony opened the door for the rebuttal testimony by his father. The trial court did not abuse its discretion in allowing the prosecution to call VanNatta's father as a witness.

VI

■■■ VanNatta argues (1) the trial court erred in denying his motion for judgment of acquittal at the close of the prosecution's case, and (2) the evidence presented at trial was insufficient to support the jury verdict that he committed the offense. VanNatta contends there was no direct evidence linking him to Ostlund's death.

■■■ Because VanNatta presented evidence after the trial court denied his motion for judgment of acquittal, we review the entire record under the sufficiency of the evidence standard. *State v. Ensz,* 503 N.W.2d

236 (N.D.1993). In *State v. Frey*, 441 N.W.2d 668, 672 (N.D.1989), we outlined our standard for reviewing sufficiency of the evidence:

"'Our duty is to sustain a criminal conviction based upon a jury verdict if, upon reviewing the evidence in a light most favorable to the verdict, we determine that there is substantial evidence to support it.

\* \* \* \* \* \*

"'A verdict based upon circumstantial evidence, however, carries the same presumption of correctness as other verdicts and will not be disturbed unless wholly unwarranted.... A conviction may be justified on circumstantial evidence alone if it is of such probative force as to enable the trier of fact to conclude that the defendant is guilty beyond a reasonable doubt.... Our role as an appellate court is to merely *review the record to determine if there is competent evidence that allows the jury to draw an inference reasonably tending to prove guilt, and fairly warranting a conviction....* Upon appeal to this Court, it is the defendant's burden to show that the evidence, when viewed in the light most favorable to the verdict, reveals no reasonable inference of guilt....'" [Emphasis in original; Citations omitted.]

In this case, the prosecution introduced evidence that Ostlund's death was caused by "ligature strangulation" with a rope or cord and that she was hit in the head with a blunt instrument and sexually assaulted. There was evidence that Ostlund's body was found wrapped in a blanket in the stairway of the apartment building where VanNatta lived; that, in statements made to the police, VanNatta admitted that Ostlund died in his apartment and that he had wrapped her in the blanket and moved her to the stairway; that luminol tests in VanNatta's apartment indicated that a mop found in his apartment had been used to clean up blood; that there were traces of blood on boots found in Van-Natta's apartment; that blood samples matching Ostlund's blood were found in Van-Natta's apartment; that rope fibers from Ostlund's neck matched fibers of a rope tied to a bed in VanNatta's apartment; and that Ostlund's clothes were found in a garbage bag in VanNatta's apartment. Although the State's evidence may have been circumstantial, viewing that evidence in the light most favorable to the verdict, we conclude that there was sufficient circumstantial evidence to support the jury verdict that VanNatta committed the crime.

## VII

Finally, VanNatta argues the trial court erred in denying his motion that the court find, as a matter of law, that the State failed to prove beyond a reasonable doubt that he was criminally responsible for his conduct.

There was conflicting evidence presented at the criminal responsibility phase of Van-Natta's trial about his mental state and criminal responsibility at the time of Ostlund's death. Because there was conflicting evidence, the issue was appropriately left to the jury and the trial court did not err in refusing to rule, as a matter of law, that VanNatta lacked criminal responsibility for his conduct. *See State v. Gefroh*, 495 N.W.2d 651 (N.D. 1993).

We affirm the conviction and the order denying VanNatta's motion for a new trial.

VANDE WALLE, C.J., NEUMANN and MESCHKE, JJ., concur.

LEVINE, Justice, dissenting.

Ordinarily, we do not evaluate the correctness of the fact-finder's reliance on and preference for one witness's testimony over another's. But every rule has its exception and I believe this case provokes the exception, not the rule. In my opinion, the insufficient weight given Dr. Schmidt's testimony by the trial court was clear error. Therefore, I dissent.

An appellate court "should take a hard look at the trial judge's ultimate conclusion and not allow the talisman of clearly erroneous to substitute for thoroughgoing appellate review of quasi-legal issues." *United States v. Makris*, 535 F.2d 899, 907 (5th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977).

As the Ninth Circuit held in *United States v. Hoskie,* 950 F.2d 1388 (9th Cir.1991), the weight afforded by the trial court to expert testimony regarding the competency of the defendant to stand trial may constitute clear error. The *Hoskie* court stated:

"In the present case ... the two experts agree about Hoskie's diagnosis and relate similar information regarding Hoskie's ability to comprehend the trial process immediately following simple explanations. They simply disagree as to the ultimate question of Hoskie's competency. Under those circumstances, because there is nothing in Dr. Grossman's report or testimony to refute the defense evidence that even Hoskie's rudimentary understanding vanished within minutes after the explanations, and because of Dr. Grossman's heavy reliance on Hoskie's ability to perform relatively mechanical functions as evidence of competency, we conclude that it was clear error to give greater weight to the report and testimony than to that of Dr. Tatro." *Id.* at 1394.

The case before us is similar to *Hoskie.* Two psychiatrists, Drs. Sharbo and Ulrich, and Dr. Schmidt, a psychologist, examined and evaluated the defendant. All three agreed that the defendant, despite a long history of mental illness, had a factual understanding of the proceedings against him. All three also agreed that the defendant's mental illness caused him to tell elaborate and detailed lies. Like the experts in *Hoskie,* the doctors' opinions vary substantially only in their ultimate conclusions as to the defendant's ability "to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960) (per curiam).

Because the reports of Drs. Sharbo and Ulrich do not refute the findings of all three experts that the defendant could not convey consistent information and held several fixed delusions, I would conclude that the trial court clearly erred in affording greater weight to the reports and testimony of Drs. Sharbo and Ulrich on these issues.

I am also uneasy about the timing of the reports of the various experts, a factor that the trial court should have considered. *See Northern Mariana Islands v. Mendiola,* 976 F.2d 475, 479 n. 3 (9th Cir.1992) ["[A] competency determination may not be based on out-of-date psychological evaluations."]; *People v. McPeters,* 2 Cal. 4th 1148, 9 Cal. Rptr.2d 834, 841 n. 1, 832 P.2d 146, 154 n. 1 (1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1865, 123 L.Ed.2d 486 (1993) [indicating that four– to six-month-old reports regarding defendant's competency were stale].

The competency hearing was held in June 1992. Dr. Schmidt had examined the defendant toward the end of January 1992; Dr. Ulrich, in early March of 1992; and Dr. Sharbo, back in July of 1991. Additionally, of the three experts, Dr. Schmidt was the most familiar with the defendant, having examined, tested and treated him when the defendant was a patient in the State Hospital years earlier. *See United States v. Birdsell,* 775 F.2d 645, 650–51 (5th Cir.1985), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1979, 90 L.Ed.2d 662 (1986) [finding that a trial court reasonably may rely on the opinion of the expert who spent more time with the defendant]. Admittedly, my discomfort over both the timing of the examinations and the disregard of Dr. Schmidt's familiarity with the defendant would not, by themselves, justify this dissent. But, their cumulative impact contributes to my firm and definite conviction that a mistake has been made about the competency of the defendant to stand trial. I would reverse.