Filed 7/29/13  P. v. Carranco CA6
Opinion on remand from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JESSE CARRANCO,<br><br>    Defendant and Appellant. | H032412<br>(Santa Cruz County<br>Super. Ct. No. F12954) |

After trial, a jury convicted defendant Jesse Carranco and codefendant Jacob Townley Hernandez ("Townley") of attempted deliberate and premeditated murder (Pen. Code, §§ 664, 187) for Townley's shooting of Javier Lazaro in Santa Cruz on February 17, 2006.  This court reversed the judgments against both defendants, finding error in the superior court's refusal to permit trial counsel to show their clients a sealed declaration by a prosecution witness attesting to his own participation in an attempted murder, along with a sealed transcript of the witness's plea agreement proceeding.  We held that the trial court had deprived defendants of their Sixth Amendment right to effective assistance of counsel by denying them access to these materials.  The Supreme Court granted review.  In Townley's case the holding that error had occurred was unchallenged by the People, and the high court expressed no opinion on this point.  It did, however, reject this court's conclusion that the error was a structural defect subject to

automatic reversal under *Perry v. Leeke* (1989) 488 U.S. 272. On the contrary, our Supreme Court held that an analysis of prejudice was required under the standard articulated in *Strickland v. Washington* (1984) 466 U.S. 668, and it accordingly remanded the case for that purpose. (*People v. Hernandez* (2012) 53 Cal.4th 1095.)

After reversing the judgment in Townley's case, the Supreme Court remanded Carranco's case to be considered in light of *Hernandez*. Having received post-remand written [and oral] argument from the parties, we now conclude that no prejudice appears on the record before us. We also consider Carranco's assertions that (1) he was deprived of his Sixth Amendment right of confrontation during his cross-examination of the prosecution witness, (2) the court improperly excluded relevant portions of his statements in a police interview, (3) the prosecutor engaged in misconduct at trial, and (4) the trial judge improperly commented on Flores's credibility. We find no prejudicial error on these grounds, however, and therefore must affirm the judgment.

*Background*

Sixteen-year-old Jesse Carranco was accused by information with attempted murder, committed with three accomplices: 17-year-old Townley, 18-year-old Jose Ruben Rocha, and 18-year-old Noe Flores. The charges arose from the gang-related shooting of Javier Lazaro around 9:00 p.m. on February 17, 2006. In a telephone call at about 7:00 p.m. that night, Townley asked Flores to "do a ride." Flores drove his 1992 white Honda Accord to pick up Townley and his girlfriend, Amanda Johnston, in Santa Cruz. Once in the car, Townley showed Flores a small black handgun, which Flores handled and returned to Townley.

Townley directed Flores to drive to Watsonville, where they picked up Carranco (known as "Little Huero") and Rocha (known as "Listo"), whom Flores had not met before. Townley was wearing People's Exhibit 23, a red and black plaid Pendleton shirt-jacket, which Johnston had given him as a gift. Carranco wore a red hooded sweatshirt; he had four dots tattooed on his knuckles, signifying his association with Northside, a

2

Norteno gang.[1]  Rocha wore a black flannel jacket with white in it.  Flores wore black sweatpants, a white T-shirt, gloves, and a black zip-up hooded sweatshirt.  In his car he carried a T-ball bat (smaller than a regular baseball bat), as he had been "tagged" by some Surenos, whom he called "scraps," in downtown Santa Cruz on December 31, 2005.

The group then drove back to Santa Cruz, dropping Johnston off before heading downtown.  Carranco said, "How's that Norte life?" to a pedestrian.

Carranco told Flores where to drive.  The group went to an apartment on Harper Street where Anthony Gonzalez lived.  About 20 minutes later, Townley, Carranco, Flores, and Rocha left the apartment, Carranco again directing Flores.  The passengers in the car were talking about finding a Sureno and saying there would be violence.  Flores later told Detective Sulay that Carranco was doing most of the talking.  According to Flores, there was no talk about shooting anyone as they drove around.

As they were moving down 17th Avenue, they saw Javier Lazaro on the sidewalk across the street, walking back to his apartment at the Ocean Terrace complex, which was located in an area known as Sureno gang territory.  Lazaro, aged 29, was not associated with any gang, but the sweatshirt he wore was blue, the color associated with the Sureno gang.  Carranco told Flores in a "[k]ind of urgent" voice to turn around and pull over, and Flores did so.  Grabbing the T-ball bat that Flores kept in the front passenger area, Carranco jumped out of the car, along with Townley and Rocha.  The three crossed the street and ran after Lazaro as Flores waited in the driver's seat with the engine running.

---

[1] According to gang expert Roy Morales, a sergeant in the Santa Cruz County sheriff's office, Nortenos and Surenos are rival Hispanic gangs.  Nortenos identify with the color red, the letter N, the Huelga bird symbol, and various representations of the number 14.  Surenos identify with the color blue, the letter M, and various representations of the number 13.  "Scrap" or "scrapa" is a pejorative term Nortenos use for Surenos.  Flores was aware that Southerners associate with blue and Northerners associate with red.  Flores denied being a Norteno gang member or associating with Norteno gang members, but he admitted associating with Norteno associates.

3

He heard what sounded like firecrackers; then the three others ran back to the car and Carranco told him "urgently" to go. Flores drove away rapidly with his passengers and followed Carranco's directions back to Gonzalez's apartment.

Lazaro testified that as he was walking back to his apartment he heard three or four voices from inside Flores's car, and then someone yelled, "Come here." He thought it was directed at someone else, so he continued walking without turning around. Just as he reached the parking lot of the apartment complex, he saw the group get out of the white Honda and run across the street toward him. They asked him whether he was Norteno or Sureno. At that point Lazaro was frightened and ran, until he felt something push him to the ground. Lazaro received five gunshot wounds, including one that fractured a rib and bruised a lung. Two bullets remained in his body.

Lazaro did not see who shot him, but Ginger Weisel, Lazaro's neighbor, was in the parking lot when Lazaro walked away from the group. She heard them call out "fucking scrap" and ask where Lazaro was from before seeing one of them shoot Lazaro six to eight times. Lazaro fell after about four shots. Weisel recalled that the shooter was about five feet, nine inches tall[2] and wore a red and black plaid Pendleton shirt. Weisel called 911 from her apartment and returned to help Lazaro.

David Bacon was driving on 17th Avenue when he saw Flores's car parked in a no-parking zone. He saw what appeared to be two Latino males of high school age, about five feet 10 inches tall. Seconds later he heard snapping sounds and saw one of the group standing in a "classic shooting position," holding a gun. He heard a total of five or six shots from what appeared to be a small-caliber gun. Bacon had the impression that the shooter wore a plaid jacket, which could have been People's Exhibit 22. The second

_____

[2] One of the detectives who investigated the case testified that Townley was about five feet, seven inches. Carranco was about five feet, six inches; and Rocha, about five feet, nine inches.

4

man appeared to be a lookout. Bacon then saw two people run back to the car, which sped away. He parked his car, called 911, and returned to help Lazaro, who was lying on the ground with two women tending to him. Emergency personnel arrived within a minute after the last shot.

Susan Randolph stepped outside her home on 17th Avenue when she heard the gunshots. She described the three as young Latinos between 16 and 20 years old, ranging from five feet, six inches to five feet, nine inches.

Julie Dufresne was driving on 17th Avenue with Jeanne Taylor when she heard popping noises that sounded like fireworks, followed immediately by three people running across the street in front of her car. They were all about her height, five feet nine or 10 inches, or probably shorter, and they appeared to be between 15 and 20 years old. One wore a thin, red and black plaid flannel jacket.

Taylor thought there were five popping sounds, followed by the "three young men" running across the street in front of the car. One of them was less than five feet, five inches and wore what looked like a plaid Pendleton shirt in black and red. He appeared to be staggering as if he were drunk or "having difficulty with his coordination." The other two were taller; one wore a white and black plaid shirt, People's Exhibit 22, and the other a hooded sweatshirt. When they reached the white car, one went to the backseat on the driver's side, and the other two went around to the passenger side. Taylor thought that People's Exhibit 23 looked like the red and black shirt the "shorter person" had been wearing; Dufresne "couldn't say for sure."

Randi Fritts-Nash was one of the teenagers drinking at the Harper Street apartment. Sitting in Gonzalez's bedroom with five others, she heard a car pull into the parking lot, followed by a couple of knocks at the window. Gonzalez went to the window and then left the room. Before he left, Fritts-Nash heard the anxious voices of two people outside, one of whom said the words "hit" and "scrap."

5

When Gonzalez reappeared, Townley and the other three were with him. Townley was wearing a red and black plaid jacket, People's Exhibit 23. Fritts-Nash heard Townley say something to Gonzalez about Watsonville Nortenos. She also saw Townley pull a small handgun out of his pocket and wipe off the prints with a blanket. Townley moved the gun several times from one pocket to another, saying, "I need to hide this gun." He also told her he was "looking at 25 to life." Rejecting Fritts-Nash's suggested hiding place, Townley put the gun in his shoe and a small black velvet bag of bullets into his other shoe. Townley told her to cross her fingers for good luck. Fritts-Nash asked him if he had shot someone; his head movement indicated an affirmative answer.

Townley and Carranco, 17 and 16 respectively at the time of the shooting, were tried together as adults under Welfare and Institutions Code section 707, subdivision (d)(2). Flores and Rocha originally were also charged as codefendants with attempted murder, but their cases were severed on Townley's motion. Before trial in this case, both Flores and Rocha entered into plea agreements in which the prosecution would reduce the charges in exchange for their declarations under penalty of perjury. Flores thereafter pleaded guilty to assault with a firearm subject to a three-year prison term, and the prosecutor dismissed the attempted murder charge against him. Rocha pleaded guilty to assault with force likely to produce great bodily injury, with an expected sentence of two years. On the same date that Flores and Rocha entered their pleas, April 17, 2007, the prosecution filed a motion to reconsolidate the cases against Carranco and Townley, which the court granted on April 26, 2007.

The jury found Carranco and Townley guilty of attempted premeditated murder. It further found that both were minors who were at least 14 years old at the time of the offense within the meaning of Welfare and Institutions Code section 707, subdivision (d)(2), and were at least 16 years old at the time of the offense within the meaning of Welfare and Institutions Code section 707, subdivision (d)(1). Townley was also found to have been armed with a handgun and to have personally used it to inflict great bodily

6

injury on Lazaro. (Pen. Code, §§ 12022.53, subds (b), (c), (d); 12022.5, subd. (a); 12022.7, subd. (a).)

Townley was sentenced to life in prison with the possibility of parole for the attempted murder, with a consecutive term of 25 years to life for the section 12022.53 firearm enhancement. Carranco was sentenced to the aggravated term of nine years for the attempted murder, plus one year for a principal's being armed during the crime.

*Discussion*

*1. Issues Related to Flores's Declaration*

    *a. Restriction on Attorney-Client Discussion of the Flores Declaration*

The guilty pleas in Flores's and Rocha's cases were taken in closed proceedings and the reporter's transcripts were sealed by trial court order. At Flores's plea hearing the prosecutor stated that Flores would be permitted to serve his sentence out of state "because he was previously stabbed in the jail. There are very serious concerns about his physical well-being."

Rocha's declaration stated that he understood that he had "to tell the judge in open court and under oath what I myself did on February 17, 2006." In Flores's declaration, on the other hand, he stated: "I understand that I have to tell the judge in open court and under oath that the contents of this declaration are true." He also stated, "I do understand that I may be called as a witness in any hearing related to the events that transpired on February 17, 2006."

At each change-of-plea hearing, the court ordered the declaration to be filed under seal, to be opened only if the prosecution called him to testify about any of the matters covered in the declaration. Defense counsel were permitted to look at the document, but they were "prohibited from discussing the contents or the existence of the document with their client or any other person." Defense counsel also were not permitted to have a copy of the declarations. As the Attorney General notes, Flores's counsel emphasized that, even if the declaration was opened under those circumstances, it "will not ultimately be

7

part of the paperwork that follows Mr. Flores to his prison commitment." The prosecutor thereafter provided a written copy to the defense attorneys.

Counsel for Townley and Carranco were unsuccessful in moving to withdraw the order not to discuss with their clients the contents or existence of Flores's and Rocha's declarations. At a hearing from which defendants were excluded, the court reasoned that it would be improper to rescind the order without Flores's and Rocha's counsel being present. The court did advise defense counsel that if the witnesses testified inconsistently with their statements, then the sealing order "would be undone" and counsel would be free to cross-examine them with the declarations. When the prosecutor asserted that defense counsel had a right to use the documents to cross-examine and impeach them, the court stated, "That's going a little beyond what we put on the record, those plea agreements. The agreement was for their protection." The court agreed with the prosecutor's statement, "So once they take the stand, the order would necessarily disappear because it doesn't make sense anymore."

Rocha did not testify at trial, but Flores was called as a witness on the second day of testimony. His testimony, the Supreme Court noted, was "essentially consistent with, but more detailed than, the information he had provided to police investigators." (*Hernandez*, *supra*, 53 Cal.4th at p. 1101.) At the end of that day, in the jury's absence, the court ordered the prosecution to give defense counsel copies of Flores's sealed declaration "in order to provide for adequate cross-examination of Mr. Flores." But the document was to be used only for cross-examination, and counsel were still not permitted to share the statement or its contents with their clients, or with investigators or other attorneys.

During cross-examination of Flores, "[b]oth defense attorneys used [his] declaration to impeach him, establishing discrepancies between it and his trial testimony. For example, witnesses to the shooting reported that the man who shot Lazaro wore a red-and-black plaid shirt or jacket. Flores testified he had worn a blue or black shirt and

8

Townley had worn a red-and-black flannel shirt. Defense counsel brought out that in his declaration Flores had asserted he had worn a red-and-black Pendleton shirt." (*Hernandez*, *supra*, 53 Cal.4th at p. 1101.)

For purposes of discussion the Supreme Court accepted the premise that the trial court had unjustifiably interfered with Townley's access to his attorney by sealing Flores's declaration and the transcript of his plea proceedings. The focus of the high court's review was the question of whether Townley was denied his right to *effective* assistance of counsel by the trial court's order forbidding counsel from discussing the declaration with his client. That question could be answered in the affirmative, thereby requiring reversal, only if Townley demonstrated prejudice from the asserted error, because this case did not present "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." (*Id*. at p. 1104, quoting *U.S. v. Cronic* (1984) 466 U.S. 648, 658.) Thus, prejudice would not be presumed in this case, because the challenged order had not rendered "the adversarial process presumptively unreliable, such as where an accused is denied counsel at a critical stage of trial, or counsel entirely fails or is unable to subject the prosecution's case to meaningful adversarial testing." (*Id*. at p.1106.) In contrast to the situation presented in *Geders v. United States* (1976) 425 U.S. 80, where petitioner was not allowed to consult with his attorney "about anything" during a 17-hour overnight recess between his direct- and cross-examination, "Townley was at all times free to consult with his attorney generally about trial tactics and defense strategy, and although he was not fully informed about Flores's probable testimony before Flores took the stand, he was not prevented from discussing how to respond to Flores's testimony after hearing it." (*Hernandez, supra,* at p. 1106.) In addition, Townley's attorney opposed the prosecution throughout the proceedings, thereby vitiating any conclusion that counsel "entirely failed to subject the prosecution's case to adversarial testing." (*Id*. at p. 1107; see also *U.S. v. Cronic, supra,* 466 U.S. at p. 659 ["if counsel entirely fails to subject the prosecution's case to

9

meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable"]; compare *Bell v. Cone* (2002) 535 U.S. 685, 697 [counsel's failure to oppose prosecution "at specific points" during sentencing required showing of prejudice under *Strickland*].)  The court also rejected any inference that the ban in this case violated Townley's right to " 'unrestricted access to his lawyer for advice on a variety of trial-related matters.' "  (*Hernandez, supra,* 53 Cal.4th at p. 1109, quoting *Perry v. Leeke* (1989) 488 U.S. 272 [in a short recess during which defendant's testimony will likely be discussed, court may deny access to attorney, contrasting *Geders, supra,* 425 U.S. at p. 91].)

In remanding Carranco's case, the Supreme Court directed this court to reconsider our prior opinion in light of *Hernandez.*  We therefore address first the question of whether Carranco can show that the interference with his right to consult with his attorney "deprived him of the effective assistance of counsel and there is a reasonable probability that, but for the error, the result of the trial would have been different." (*Hernandez, supra,* 53 Cal.4th at p. 1111.)

To establish prejudice in accordance with the Supreme Court's decision, Carranco must adhere to the standard enunciated in *Strickland*— that is, he must show that the interference "actually had an adverse effect on the defense." (*Strickland*, *supra*, 466 U.S.at p. 693.)  More precisely, there must be a "reasonable probability" that without the error, "the result of the proceeding would have been different." (*Id*. at p. 694.)  "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." (*Id*. at pp. 691-692.)  "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." (*Id*. at p. 696.)  Thus, "[t]he benchmark for

judging any claim of ineffectiveness must be whether [the error] so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Id.* at p. 686.)

"Surmounting *Strickland's* high bar is never an easy task." (*Padilla v. Kentucky* (2010) 559 U.S. 356, __ [130 S.Ct 1473, 1485].) "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding[, as] not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." (*Strickland*, *supra*, 466 U.S. at p. 693.) Nor must a defendant show that the deficiency "more likely than not" altered the outcome in the case. (*Ibid.*) The asserted error must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Id.* at p. 687; *Harrington v. Richter* (2011) ___ U.S. ___ [131 S.Ct. 770, 787-788].) Accordingly, a defendant must show "a reasonable probability" that the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694.)

In *Hernandez* our Supreme Court implicitly compared the situation presented here to a Confrontation Clause issue such as that considered in *Delaware v. Van Arsdall* (1986) 475 U.S. 673, a case in which the trial court improperly prevented the defense from eliciting bias during cross-examination of a prosecution witness by questioning him about the dismissal of his public drunkenness charge.[3] The Supreme Court in *Hernandez*

---

[3] In contrast to a *Strickland* ineffective-assistance claim, however, in a confrontation clause violation, "the focus of the prejudice inquiry . . . must be on the particular witness, not on the outcome of the entire trial." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.) The standard adopted in *Van Arsdall* followed *Chapman v. California* (1967) 386 U.S. 18, 24—that is, the error was required to be harmless beyond a reasonable doubt.

11

cited the factors employed in *Van Arsdall*,[4] yet not to assess the prejudicial effect of the lower court's restriction on the use of the declaration, but to support the conclusion that "the circumstances presented here . . . do not justify a presumption of prejudice." (*Hernandez, supra*, 53 Cal.4th at p. 1108.) The court notably added, "There is no reason in logic to require a showing of prejudice to establish reversible error when impeaching evidence is withheld from a defendant *and the defendant's attorney*, but to *presume* prejudice when impeaching evidence is withheld *only from the defendant*, even it was the trial court and not the prosecution that prevented the defendant from learning about the evidence." (*Ibid.,* italics added.)

Carranco suggests that the unchallenged portion of our previous holding alone "cannot be reconciled with a conclusion that the order was a harmless restriction on the right to counsel." He does not elaborate except to invoke the doctrines of law of the case, res judicata, and collateral estoppel, which he states bar relitigation of this court's prior "findings." To accept Carranco's position, however, would be to disregard completely the direction of the Supreme Court in *Hernandez* and its instruction in its remand of this case to reconsider our opinion in light of *Hernandez*. That disposition means that Carranco must make a showing of prejudice consistent with the *Strickland* standard in order to obtain reversal in his own case.

Carranco first reminds us that the gag order prohibited defense counsel from discussing the assertion in Flores's declaration that it was Carranco who told him where to go and when to stop, "which suggested that he had a leadership role." As a result,

---

[4] " 'These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " (*Hernandez, supra,* 53 Cal.4th at p. 1108, quoting *Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 684.)

"[t]he prosecution's case against appellant was considerably strengthened by this new and surprising allegation because it allowed the prosecutor to argue that appellant had a leadership role in the 'mission' and therefore must have been a knowing participant in the shooting." But this argument goes to the effect of the declaration statements; it does not show prejudice. There is no claim that defense counsel was unable to cross-examine Flores effectively about Carranco's leadership role in the attack on Lazaro; indeed, counsel did challenge Flores on this point, highlighting the fact that in his police interview Flores had not specified Carranco as the person who had told him where to turn and when to stop. There is no argument that had defense counsel been allowed to discuss the declaration with his client, Carranco would have shed some light that would have assisted in his defense.

The length of the jury's deliberations (three days) is also not a persuasive factor here; this was a complex case involving a serious crime involving multiple perpetrators, with multiple witnesses offering inconsistent testimony at trial. (Cf. *In re Sassounian* (1995) 9 Cal.4th 535, 549, fn. 10 [closeness of case not determined by jury's time spent deliberating, given complexity of evidence and law, youth of petitioner, and other circumstances]; *People v. Cooper* (1991) 53 Cal.3d 771, 837 [seven-day deliberations indicates conscientious jury but not necessarily close case considering three-month duration of trial and complexity of issues]; see also *People v. Houston* (2005) 130 Cal.App.4th 279, 301 [four-day deliberation speaks to jury's diligence, not closeness of case, where trial was extensive, with lengthy arguments, more than three dozen witnesses, and a "mass of information" to digest].) Carranco has thus failed to overcome the "high bar" of the prejudice analysis here.

*b. Restrictions on Cross-Examination of Flores*

Carranco next contends that the court unfairly sustained objections by the prosecutor during his cross-examination of Flores. Carranco's attorney attempted to point out, for example, that (1) the declaration Flores signed was not the first draft (prosecutor's

13

objection not ruled upon); (2) the declaration had omitted any account of Flores's first visit to the Harper Street apartment; and (3) the declaration had omitted the detail that Carranco directed Flores, who was driving, back to the apartment. To these efforts the prosecutor successfully objected. The prosecutor also successfully objected to defense counsel's reading the title of the document, which indicated that Flores was charged with a crime. Carranco's counsel tried to ask Flores about the requirement that he sign the declaration in order to obtain the three-year sentence; again the prosecutor's objection was sustained, as was a question about Flores's methamphetamine use on the night of the shooting.

In the jury's absence, the court explained that it had sustained some of the prosecutor's objections because they were "questions about things that weren't in the document . . . suggesting to the jury that we'd intentionally omitted facts. And that's misleading." Eventually the trial court took judicial notice of the fact that the declaration was part of a plea bargain and accordingly instructed the jury.

Carranco argues that the trial court's rulings "cut off all inquiry into the origins of Flores's claim that [Carranco] acted as leader and thereby crippled his defense." The subjects on which the prosecutor's objections were sustained, however, were either nonprejudicial or irrelevant to refute the leadership role of Carranco in the events preceding the shooting. Reading the title of the declaration, for example—"People of the State of California versus Noe Antonio Flores"—was of no consequence, as counsel had already established (and the jury was reminded later) that Flores had pleaded guilty to assault with a firearm in exchange for dismissal of the original attempted murder charge. Counsel's subsequent attempt to delve into prior drafts of the document, as well as questions about who wrote the declaration he signed, were properly curtailed, as they were not relevant to the credibility of the witness and any inconsistencies between the declaration and his trial testimony; indeed, as the trial court explained, unsigned versions of the declaration were "not evidence of anything." Nor are we convinced by Carranco's

14

suggestion that it was important to impeach Flores with those facts he had related in his testimony but not included in his declaration, so he could show that Flores was "magnifying [Carranco's] role to please the prosecution and obtain the favorable plea deal." Flores had already secured the plea deal. In any event, Carranco's attorney did elicit Flores's admission that he had not mentioned that Carranco was directing him until talking to the district attorney in preparation for trial. In his police interview he had just said that "they" told him where to turn. Counsel was also able to obtain Flores's admission that he had not mentioned the first visit to the Harper Street apartment when interviewed by the police. Flores's overall credibility was challenged not only through admissions that he had omitted details in talking to the police, but through inconsistencies between his testimony and his declaration, including whether he touched the clip of Townley's gun and whether he was wearing the red and black Pendleton. The court made it clear that such inconsistencies were a permissible subject of cross-examination.

More significantly, we do not agree with Carranco that the rulings, even if erroneous, were prejudicial. The correct inquiry is whether, "assuming that the damaging potential of the cross-examination [had been] fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." (*Delaware v. Van Arsdall*, *supra*, 475 U.S.at p. 684.) "Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (*Ibid*.) Defense counsel conceded that Carranco was an active participant in the crime, that he took a bat and jumped out of the car with the intention of doing violence toward Lazaro. Here, even if the trial court abused its wide discretion in limiting cross-examination when it regarded the questions as misleading or of marginal relevance,

15

Carranco has not shown that the additional questions would have given the jury "a significantly different impression" of Flores's credibility." (Cf. *Delaware v. Van Arsdall*, *supra*, 475 U.S.at p. 680 [whether Confrontation Clause violation occurred depends on whether jury could have derived a "significantly different impression" of witness's credibility].) For the reasons we have explained above, any Confrontation Clause violation was harmless beyond a reasonable doubt.

## 2. *Exclusion of Statements to Police*

Carranco further contends that the trial court erroneously excluded portions of his statement to the police, which "left the jury with the false impression that he [had] confessed to participating in the shooting." We briefly review the events of the interview.

On February 23, 2006, Carranco was interviewed by Santa Cruz Sheriff's Detectives Henry Montes and Mario Sulay. Montes interviewed Carranco for about 90 to 120 minutes before Sulay got involved.

A broad overview of Carranco's lengthy interview (319 pages) reveals that it progressed through four distinct stages of what he was willing to admit. In the first stage, Detective Montes read him his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436). Carranco acknowledged that he had been read his rights several times before and that he had a probation officer. Confronted by Montes with statements by others that he had gotten into a car with three other people, ridden to Santa Cruz, and gone to an apartment on Harper Street, Carranco repeatedly and adamantly denied that he had ever left Watsonville that night. He said he was hanging out with a friend named Ruben (nicknamed "Listo"), smoking marijuana and drinking beer. He originally claimed to have spent time with his cousin Alfonso ("Frank"), but later admitted that he had just called him on someone else's cell phone. He admitted that his friend "Jake" (Townley) came by to give him a ride, but he denied accepting it.

16

In the second stage of the interview, Carranco admitted to Montes that he had accepted a ride to Santa Cruz and gone to the apartment on Harper Street, but he repeatedly denied being at the scene of the shooting. He said he heard people at the apartment, in particular a guy named Michael, talking about the shooting.

In the third stage of the interview, after Montes left the room for a half-hour and returned, Carranco reasserted that he had not left Watsonville that night. Montes left the room again to buy food, taking a food order from Carranco.

In the fourth and final stage of the interview, Carranco finally admitted his presence at the scene of the shooting and described his conduct that night.

On May 1, 2007, Carranco filed a motion in limine to exclude from evidence his statements to the police as involuntary and taken in violation of *Miranda*. At a pretrial hearing on May 3, 2007, the trial court concluded that all of his statements were voluntary, and that there was no *Miranda* violation after he was taken to the police station and given *Miranda* warnings.

On May 3, 2007, Carranco moved to admit some of his statements from his police interview in addition to those which the prosecution sought to introduce into evidence. At a pretrial hearing on the same day, counsel argued that the statements were admissible, even if they were self-serving. The court disagreed, stating, "You basically, don't get to have him tell you all the rest of the self-serving part of the statement without him being present for cross-examination." The court identified what parts of Carranco's police interview would be admitted into evidence by making notations on the written proffers by both sides.

The court excluded the following statements as either violating Townley's right of confrontation, irrelevant, or irrelevant and self-serving: Carranco did not know the driver of the car, who was wearing a black beanie. Jake was in the car. He, Jake, Ruben, and the driver were looking for a party. The guy on the sidewalk looked like one of the guys who had beat him up. He did not know that Jake had a gun. He thought it was weak to

17

use a gun in a fight. When he heard shots, he thought he was being shot at, so he ducked and ran back to the car and saw Jake and others running back to the car. He did not know who was shooting. Carranco told the driver to leave because he believed someone was shooting at them. The trial court instructed the jury that they had heard only part of Carranco's statement and they should not "speculate about the content of the excluded portion of that statement."

Carranco complained about the exclusion of these statements in an unsuccessful motion for a new trial. In rejecting his challenge the court stated that the parts of his interview that Carranco sought to admit were not related to the parts of the interview that the prosecutor wanted to admit. The prosecutor "requested use of certain admissions by Mr. Carranco [that] were very clear and very precise." "But the statements that you want . . . are just purely self-serving statements that don't relate to any of the admissions that Ms. Rowland sought to use."

On appeal, Carranco contends that the court's ruling was improper under Evidence Code section 356. That provision states: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

"The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' " (*People v. Arias* (1996) 13 Cal.4th 92, 156; cf. *People v. Douglas* (1991) 234 Cal.App.3d 273, 285.) "In applying Evidence Code section 356 the courts do not

18

draw narrow lines around the exact subject of inquiry." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1174; *People v. Vines* (2011) 51 Cal.4th 830, 861.)  It is no objection to the other statements that they would otherwise be excludable hearsay.  (*People v. Williams* (1975) 13 Cal.3d 559, 565.)  However, the proponent must show some connection to evidence admitted. (*People v. Hamilton*, *supra*, 48 Cal.3d at p. 1174.)  Statements that are irrelevant to those being admitted may be excluded (*People v. Gambos* (1970) 5 Cal.App.3d 187, 192-193; *People v. Von Villas* (1992) 10 Cal.App.4th 201, 272; see *People v. Williams, supra*, 13 Cal.3d at p. 565), as may statements that are subject to exclusion under section 352.  (Cf. *People v. Samuels* (2005) 36 Cal.4th 96, 130; see also *People v. Vines, supra,* 51 Cal.4th at p. 863; *People v. Von Villas, supra*, 10 Cal.App.4th at p. 272.)

The situation becomes more complicated when, as in this case, the proffered exculpatory statements may also incriminate a codefendant.  To avoid problems under *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123, a defendant's confession must be redacted so as to avoid incriminating a codefendant. But "[w]hen deletions cannot be made without prejudice to the declarant the court should either grant severance or exclude the statement." (*People v. Douglas, supra*, 234 Cal.App.3d at p. 285; *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1098.)

On appeal, we review a trial court's determination under Evidence Code section 356 for abuse of discretion.  (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.)  We find no such abuse here.  "Application of Evidence Code section 356 hinges on the requirement that the two portions of a statement be 'on the same subject.' " (*People v. Vines, supra,* 51 Cal.4th at p. 861.)  The subjects of Carranco's statement that the defense acknowledged were admitted concerned (1) what the victim and Carranco were each wearing; (2) Carranco's intention to fight the victim; (3) Carranco's having run after the victim with the bat; (4) Carranco's identification with Northside Santa Cruz; and (5) Carranco's dislike of Surenos.  That Carranco didn't see who shot the gun was, as the trial

court ruled, outside the scope of "the very limited admissions" that the prosecutor wanted to introduce.  Likewise, that Carranco did not know the driver was outside the scope of the prosecutor's intended evidence, and it was irrelevant in any event.  Not knowing that Townley had a gun was properly excluded as evidence implicating Townley.  (Cf. *People v. Gamache* (2010) 48 Cal.4th 347, 381 [defendant's implication of codefendants inadmissible under *Aranda* and *Bruton*].)  The jury heard the portion of Carranco's statement indicating that he got out of the car intending to fight Lazaro because he looked like a guy he had gotten into a fight with at a party the previous weekend.  The court did not abuse its discretion in excluding the proffered statements from the evidence presented to the jury.

### 3. Prosecutorial Misconduct

Carranco joins in Townley's argument that the prosecutor engaged in "egregious" misconduct at trial.  Like his opening brief in his original appeal, Carranco's supplemental post-remand brief contains no separate, specific contention that the prosecutor's questioning of witnesses and argument to the jury resulted in prejudice as to him.  Because there is no individualized claim of misconduct as to him, we will restate our discussion of the misconduct claimed in Townley's case.

#### a. Comments on Witness Credibility

"It is misconduct for a prosecutor to express a personal belief in the merits of a case, rather than a belief based upon the evidence at trial.  [Citations.]"  (*People v. Johnson* (1981) 121 Cal.App.3d 94, 102.)  Similarly, "[t]he prosecutor is generally precluded from vouching for the credibility of her witnesses, or referring to evidence outside the record to bolster their credibility or attack that of the defendant.  [Citations.]"  (*People v. Anderson* (1990) 52 Cal.3d 453, 479.)  However, when the prosecutor relies on the evidence presented at trial and the inferences to be drawn from this evidence, and does not imply any personal knowledge or belief based on facts outside the record, the prosecutor has not engaged in improper " 'vouching.' "  (*People v Medina* (1995) 11

20

Cal.4th 694, 757; see also *People v. Frye* (1998) 18 Cal.4th 894, 971, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [prosecutor's comments not improper vouching if assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the facts and reasonable inferences, not purported personal knowledge or belief].)

During opening statement the prosecutor told the jury that the police sergeant who interviewed Townley at Harper Street "felt that he was holding back and not being entirely truthful. The sergeant thought that maybe that was because they were in a Norteno[-] affiliated house and he was investigating a shooting by three or four guys wearing red who shot at another guy in a blue sweatshirt. [¶] So the decision was made to take them to the Sheriff's Office for an interview to see if in a different kind of environment he might be more forthcoming." When the jury had been dismissed for the day, Townley's attorney objected and moved for a mistrial, reminding the court that during in limine motions he had opposed the prosecutor's request to call a gang expert. In that opposition counsel had expressed the concern that the expert might suggest that a witness was lying to help the defendant or that a former codefendant testifying for the prosecution was credible. The court had allowed the gang expert to testify, but only as to matters the jury had heard from other witnesses. The expert was not to "address issues like snitch and rat and veracity and credibility . . . unless it's become apparent from the testimony of . . . witnesses that there's a basis for that needing to be explained to the jury in some way. [¶] But he cannot be put in a position where he is either vouching for the credibility of your witnesses or . . . essentially negatively vouching for them in any way . . . ."

The trial court denied the mistrial motion, noting that the "no vouching" order pertained to a different situation: "What was referred to here was actually the policeman's impression of behavior that he saw from a person that he was interviewing at

that time," in contrast to the pre-trial discussion of an opinion of a witness's credibility because he or she was a "snitch."

In examining Sarah Oreb, the prosecutor attempted to bring out the inconsistencies between her trial testimony and her prior statements to the police. After an initial hearsay objection (without a ruling) Oreb was permitted to describe the officers' tactics in trying to persuade her to admit that she had heard Townley say he had "hit a scrap." The defense did not object as Oreb continued with this testimony and denied that Sergeant Fish had accurately reported her voluntary statement to him. However, at one point the prosecutor, having repeatedly attempted to elicit Oreb's admission that she had heard the "hit a scrap" statement, said, "I suppose you wouldn't be surprised to hear I don't believe [you]. Which is why I am continuing to ask the question." Townley's counsel immediately objected. The objection was sustained, and the court admonished the jury to disregard the remark. The prosecutor then asked Oreb, "If there's a recording of your interview with both Deputy Pintabona, and a subsequent interview with Detective Henry Montes, they edited those recordings?" The objection by Townley's counsel to this argumentative question was also sustained.

Further into her testimony, Oreb was insisting that she had lied every time she said she had heard the "hit a scrap" statement. She maintained that it was not acceptable to lie, which was why she was then telling the truth. The prosecutor asked, "Okay. So recently, within the last two weeks, you decided that you shouldn't lie? [¶] [Oreb]: No, not within the last two weeks. [¶] [The prosecutor]: When did you decide you weren't going to lie? . . . [¶] [Oreb]: I don't know. [¶] [The prosecutor]: When did it become important to you not to lie? [¶] [Oreb]: It's always been important to me not to lie. [¶] [The prosecutor]: Apparently it wasn't so important each time you talked to somebody in law enforcement?" Again both defense attorneys objected to the question as argumentative, but this time the court overruled the objection. However, just before playing the recording of the first interview, the prosecutor asked why Oreb had lied about

22

hearing a knock at Gonzalez's apartment window. Oreb recounted how she had merely told the interviewer what he wanted to hear. The prosecutor asked, "Did it occur to you that he didn't believe you?" Defense objections were sustained as argumentative and calling for speculation.

Oreb also testified that she used Townley's name and the words about hitting a scrap because that was what she had heard from others. Defense objections were raised on hearsay grounds. The trial court overruled one objection on the ground that it went to credibility. When defense counsel affirmed that the questioning was relevant to credibility only and not for the truth, the court explained to the jurors that as to these questions about the source of Oreb's information, they could use Oreb's testimony not for the truth of what other people said but only to determine whether Oreb was telling the truth about her recollection.

Anthony Gonzalez also recanted the statement he had made about the shooting in police interviews. Like Oreb, he said he did not remember what had happened that night and had simply told the police what they wanted to hear because they had arrested him. Gonzalez said he kept telling the detectives what he knew and they kept telling him it wasn't true. Later, the prosecutor asked Detective Ramsey about a subsequent interview with Gonzalez. Ramsey testified that the purpose of the second interview was to "see if he'd be a little bit more up front and cooperative" with the officers. The prosecutor then asked, "And did you find that he was a little bit more forthcoming?" Townley's attorney objected to the question as irrelevant, and the objection was sustained.

"The standards governing review of misconduct claims are settled. A prosecutor commits misconduct under the federal Constitution when his or her conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct even when those actions do not result in a

23

fundamentally unfair trial."  (*People v. Hawthorne* (2009) 46 Cal.4th 67, 90, citing *People v. Frye, supra,* 18 Cal.4th at p. 969.)

" '[A] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. . . . However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [her] comments cannot be characterized as improper vouching. [Citations.]' [Citation.]"  (*People v. Ward* (2005) 36 Cal.4th 186, 215.)

"In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.  (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 . . . .)"  (*People v. Hawthorne, supra,* 46 Cal.4th at p. 90; *People v. Lopez* (2008) 42 Cal.4th 960, 965-966.)

Townley contends that "clear misconduct" occurred when the prosecutor commented on Oreb's lack of credibility.  The court sustained the objection to that remark, however, and admonished the jury accordingly, thus averting any prejudice.  The reference to the police impressions during opening statement and the questioning about Oreb's lies likewise created no reversible misconduct.  The court properly ruled that the opening statement did not violate the in limine order; and the court sustained defense counsel's objections to argumentative questioning of Oreb with only one exception.  That exception could not have had a significant impact on the jurors' perceptions of the case, as it only emphasized what they already knew, that Oreb had lied during questioning by the police.  The subsequent jury instruction to ignore any question to which an objection was sustained reinforced the court's admonition and thus prevented any prejudice.  It is also noteworthy that no requests to admonish the jury followed the objections to the prosecutor's questions.

24

Otherwise, the examination of Oreb proceeded without objection on the ground now asserted. Townley has forfeited the issue as to these questions, and neither he nor Carranco presents analysis to support the bare assertion of ineffective assistance of counsel. In any event, it is clear that Oreb's insistence that she had lied to the police supported Townley's defense. Thus, allowing the prosecutor to elicit this testimony was justified as a tactical choice by the defense. Failing to object to asserted prosecutorial misconduct does not warrant reversal on appeal for ineffective assistance of counsel "except in those rare instances where there is no conceivable tactical purpose for counsel's actions." (*People v. Lopez, supra,* 42 Cal.4th at p. 972.)

As to the prosecutor's examination of Gonzalez, the only objections made by the defense were for hearsay, leading, and irrelevance. The recordings of both Oreb and Gonzalez were allowed over the objection that they did not contain prior inconsistent statements. The court properly ruled in both cases that the witnesses had fabricated their testimony—in Oreb's case, that she had heard nothing at the window, and in Gonzalez's case, that he did not remember anything that had happened that night.

b. *References to Townley's Bad Character*

(1) *Involvement in previous criminal activity*

Without objection from the prosecution the court granted a defense motion in limine to preclude evidence that Townley had a juvenile record and was on juvenile probation at the time of the offense. Also precluded without objection was evidence or allegations that Townley might have been involved in other shooting incidents. Nevertheless, early in direct testimony by Detective Phillips, the prosecutor asked him what he had been asked to do on February 18, 2006. He answered that he had been asked to assist another detective in conducting a probation search, and he started to recite the address when both defense attorneys and the prosecutor interrupted with objections. After conferring privately with the witness, the prosecutor resumed her examination with the question, "You did a probation search first thing in the morning on a different case; is

25

that right?"  The witness replied in the affirmative, and when asked whose house he searched, he named the people who lived there, including defendant Townley.

Later, during testimony by Scot Armstrong, a ballistics expert, he mentioned two sheriff's numbers corresponding to two cases.  Subsequently he was referring to "fired cases" identified as "REG-1, number 1 through 4.  REG-110.  And 131MH-001."  The prosecutor directed the witness's attention to the five "REG" casings submitted when Townley's attorney obtained a sidebar conference.  After completion of Armstrong's examination, both defense attorneys moved for a mistrial.  The prosecutor acknowledged the in-limine ruling but noted that she had directed the witness not to mention any other investigations.  "Clearly, he forgot."  The slip, the prosecutor stated, "certainly was not anything intentional."  Moreover, she argued, the jury was not likely to have understood what the witness was referring to by "SCD" numbers and different casings.  The court agreed that "there was not enough there that the jury could possibly infer that there were other investigations going on or there were other bullets or casing being investigated beyond what's in this case."

On appeal, Townley contends that the prosecutor engaged in "highly prejudicial misconduct" by eliciting information about his probation status and other shootings.  He maintains that not only was the mention of a probation search improper, but the prosecutor "compounded the problem" by informing the jury "*both* that Townley was on *probation*, and that he was a suspect in a *different* case."

While "[i]t is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order" (*People v. Crew* (2003) 31 Cal.4th 822, 839), it is evident from the record that the incipient reference to a probation search occurred because Phillips forgot to avoid mentioning any case but this one.  It is true that a prosecutor " 'has the duty to guard against statements by his witnesses containing inadmissible evidence,' and if a prosecutor 'believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain

26

from making such a statement.' " (*People v. Earp* (1999) 20 Cal.4th 826, 865.) Here, however, the prosecutor did warn the witness not to refer to other investigations; and when he slipped, she interrupted her examination apparently to remind him. As in *Earp*, "nothing in the record suggests that the prosecutor had a basis for anticipating the response in question by Detective [Phillips]. Therefore, there was no prosecutorial misconduct." (*Ibid.*)

As to the disclosure of the additional forensic investigation, Townley disputes the People's characterization of the disclosures as inadvertent; in his view, it was part of a "demonstrated pattern of ignoring or attempting to evade the trial court's rulings." We find no error in the trial court's ruling, however. As did the trial court, we find the prosecutor's brief references to obscure case numbers unlikely to encourage the jurors to speculate that Townley was being investigated for other shooting incidents. She mitigated potential harm by refocusing the witness's account on the shooting of the night before, relegating the mention of a probation search to an apparently unrelated case. The court's determination that the disclosure was obscure, unintentional, and unlikely to cause prejudice is supported by substantial evidence.

### (2) Evidence that Townley was Dangerous

Detective Ramsey testified that while Detective Makdessian was transporting Townley to the sheriff's station, Ramsey, who was in the car ahead, received information from Sergeant Sulay that caused him to alert Makdessian to stop the patrol car. The officers asked Townley to step out of the car; then they handcuffed him and examined his shoes. Inside the right shoe was an unloaded pistol; in the left shoe was a bag containing cartridges. During the direct examination of Ramsey, the prosecutor asked him to describe his "degree of alertness" in this encounter. The witness replied, "Extremely heightened." The prosecutor then asked, "Did you feel that your safety was in danger?" The witness answered, "Yes." At that point, however, Townley's attorney objected and moved to strike. The court granted the motion and admonished the jury to disregard the

answer. The prosecutor's next question, whether Ramsey had his gun out, was answered in the negative; but when she asked why not, his answer-- "I didn't want to --" was interrupted by another objection on irrelevance grounds, which was also sustained.

While Detective Makdessian was describing the same events, he stated that while transporting Townley he received an urgent call from then-Deputy Fish over the car radio, which the detective returned by cell phone. The prosecutor asked, "Did you have a physiological response after you had that phone conversation with Sergeant Fish?" Defense counsel objected to the question as irrelevant, and the court sustained the objection. After describing Detective Ramsey's removal of the gun from Townley's shoe, Makdessian was asked, "Had you ever transported somebody unhandcuffed with a gun before?" He answered, "Never." The prosecutor continued, "Do you anticipate ever doing that again?" Another defense objection to the irrelevant question followed and was sustained.

Sergeant Fish was also questioned about the discovery of the gun. Hearsay and irrelevance objections were sustained to two questions: about what a witness had told him and about whether Sergeant Sulay's telephone call was related to officer safety. Because the question about officer safety was answered ("Very much") before the objection was sustained, the court instructed the jury to disregard the answer.

Townley contends that this line of questioning improperly suggested that Townley was a danger to the officers' safety. The questions, however, did not imply that the officers were actually threatened by Townley, nor that their safety concerns were caused by anything other than the knowledge that there was a passenger in the backseat with access to a weapon. In any event, the questions were at worst irrelevant and they provoked objections sustained on that ground. No prejudice resulted from the prosecutor's line of questioning about officer safety. Carranco himself offers nothing to suggest that any perception of Townley as dangerous might have carried over to his own case.

28

Townley further argues that the prosecutor tried to give the jurors the impression that Flores was in protective custody because the defendants were a threat to him. The prosecutor was permitted to bring out Flores's statement that he was in "PC," or protective custody. When the prosecutor asked whether he was in protective custody because he had given a statement to the sheriff's deputies, the objection as speculation was sustained. Then the prosecutor asked, "Who is housed in protective custody?" Objections on multiple grounds followed, and the court suggested that the prosecutor move on to other questions until they could discuss the issue later. After the jury had left for the day, the prosecutor protested that it was important to present the evidence that he had to be housed in protective custody and transported separately because he was a snitch and had negative feelings about that "category." The court pointed out that Flores had said he was not afraid to be there testifying. Following extensive debate on the issue, the court cited the right to a fair trial and sustained the defense objection.

Flores eventually admitted that he did not want to tell the police about what his companions had done the night of the shooting because he did not want to get them in trouble. The prosecutor questioned Flores further about what he thought of people who told the police about crimes others had committed. Her questions about why Flores did not want to tell the police what had happened the night of the shooting were permitted; but the court sustained relevancy objections to her question about what word was used to describe a person who told the police what someone else had done, as well as the questions about what Flores thought about such people. The court overruled the objection to the question whether he wanted to be such a person. Flores said he might get hurt. The prosecutor was not so successful in asking whether Flores felt like a Good Samaritan; he did not have an opinion about whether a person who told the police about a crime was a Good Samaritan, and he did not feel like one when he was talking to the police. The question "Why not" was met with another objection, which was sustained as

29

irrelevant.  At that point the court directed the prosecutor to move on to another area, and she did.

The prosecutor later asked Flores whether he had wanted to talk to the police; he said he had not.  When she asked why, a defense objection was overruled and Flores simply answered that he had not wanted to get in trouble.  Flores explained that he had eventually told the truth to  Sergeant Sulay, though he did not like talking to him.  The question "Why not?" was again met with an irrelevance objection, which was sustained. Also sustained were similar objections to the question, "Why did you ultimately tell Sergeant Sulay the truth?" and the question, "What did you think about yourself for [telling Sergeant Sulay what had happened the night before]."

Ginger Weisel, the victim's neighbor at the Ocean Terrace apartment complex, testified at length about what she had seen that night.  On redirect, the prosecutor asked whether she wanted to be there testifying; she answered that she did not.  The prosecutor asked why; and the defense objection ("352") was overruled.  The witness responded that she did not "need to be part of this" and did not "want problems."  She then was allowed, over objection, to testify that she was familiar with gangs and knew there were Surenos living at the complex.

The jury subsequently heard from Detective Montes, the gang investigator who related Oreb's statement that she had "heard somebody say they hit a scrap."  Oreb was not threatened with custody, nor was Gonzalez in custody at the time of the detective's interview with her.  The prosecutor asked Detective Montes whether it had appeared to him that Oreb "was at all reluctant" to tell him that she did not remember looking out the window, but defense objections were sustained.  The prosecutor then asked whether Oreb's demeanor had suggested any reluctance or timidity, and another objection was sustained.  The jury was instructed to disregard the last two answers, but no answer to either question exists on the record.

When Gonzalez was describing his interview with sheriff's deputies, he was asked whether he was "scared" while talking to them. The court sustained defense counsel's objection to the question as irrelevant. Also sustained were questions about whether he remembered contrasting his concern about his freedom "with something else" (irrelevant); whether he had wanted to speak with the police officers (irrelevant), and whether he wanted to be there testifying (asked and answered). Later the prosecutor asked, "Did you feel that, or do you feel now that talking about what happened that night is dangerous for you?" The objection ("irrelevant. 352.") was sustained. Then the prosecutor repeated the question, "Do you want to talk about what happened that night?" The same objection was sustained, along with the court's comment that this question had been asked and answered.

This record reveals that to the extent that the prosecutor sought to portray witnesses as in fear of Townley, she was unsuccessful. Whenever she asked a question that could have suggested an answer revealing fear by a witness, defense counsel interrupted with a timely objection, and if the witness had already answered, the jury was instructed to disregard it. In addition, the jurors were instructed at both the beginning and the end of trial that the attorneys' remarks and questions were not evidence; only the witnesses' answers were evidence. They also were told that if an objection was sustained, they must ignore the question, refrain from guessing what the answer might have been, and disregard any answer that might have been given. (Cf. *People v. Hamilton* (2009) 45 Cal.4th 863, 928-929 [instruction that attorneys' questions were not evidence eliminated the possibility of jury's considering facts not in evidence].) "As a general matter, we may presume that the jury followed the instructions it was given . . . and defendant has failed to supply any persuasive reason to suppose the jury instead would have accepted as evidence the insinuation allegedly implicit in the prosecutor's questions." (*People v. Prince* (2007) 40 Cal.4th 1179, 1295.) Accordingly, no prejudice could have resulted

31

from any improper questions posed by the prosecutor.  Carranco does not show otherwise.

### c. Comments during Argument to the Jury

"When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]  A prosecutor is given wide latitude during closing argument.  The argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom.  ' "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets . . . .' " . . . .' " (*People v. Harrison* (2005) 35 Cal.4th 208, 244*; People v. Williams* (1997) 16 Cal.4th 153, 221.)

" 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood that the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 337.)  "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye*, *supra*, 18 Cal.4th at p. 970.)  "We presume the jurors treated 'the prosecutor's comments as words spoken by an advocate in an attempt to persuade' [citation] . . . ." (*People v. Cole* (2004) 33 Cal.4th 1158, 1204.)  In addition, while a defendant may single out certain comments made by the prosecutor during argument in order to demonstrate misconduct, as the reviewing court we "must view the statements in the context of the argument as a whole." (*Id*. at p. 1203.)  Finally, " 'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (*People v. Harrison, supra,* 35 Cal.4th at p. 244; *People v. Bolton* (1979) 23 Cal.3d 208, 214.)

32

### (1) Appealing to Fear of Gang Violence

Townley protests the prosecutor's "improper comments that preyed upon the jury's fear" during her argument. One of the challenged remarks occurred in the context of the prosecutor's discussion of the natural and probable consequences of an assault: "Is somebody almost dying a natural and probable consequence of assaulting a rival gang member in that rival gang member[']s turf? Read about it all the time. You read . . . about it all the time. Gang fights where somebody ends up dead." At this point Carranco's attorney objected, but the prosecutor maintained that she was only talking about natural and probable consequences. The court cautioned her to be "careful about the intent issue" and overruled the objection. The prosecutor then continued with the point that one has to intend the assault, but "almost being killed [was] a natural and probable consequence" of an attack by a rival gang member.

During her closing argument, the prosecutor used the facts that Lazaro was shot five times and that "there were additional bullets brought" to show that Townley had premeditated and planned to kill the victim. She queried, "Why did he need all those bullets? Why did he need all those bullets? Maybe they were going to go out and do another one. But why, if you don't mean to kill somebody, do you need to have to [*sic*] all that?" Carranco's attorney objected that "[k]illing is an improper argument," but the objection was overruled.

Townley contends that these comments, together with the questions suggesting that the officers were in danger from the defendants and that the witnesses feared the defendants, "were a blatant plea to the fears and vulnerabilities of the jurors, and were calculated 'to induce a level of fear in the jurors so as to guarantee a guilty verdict.' " He compares this situation to *Commonwealth v. Mendiola* (9th Cir. 1992) 976 F.2d 475 (overruled on another ground in *George v. Camacho* (9th Cir. 1997) 119 F.3d 1391), where the prosecutor's appeal to jury fears of the defendant's dangerousness constituted clear misconduct from which prejudice was "highly probable." (*Id*. at p. 487.) This case,

33

however, bears no resemblance to *Mendiola*. There the prosecutor's inflammatory argument evoked an image of a dangerous criminal who, if freed, would walk out of the courtroom "right behind" them and retrieve the gun.[5] (*Id*. at p. 486.) In this case the prosecutor's speculation about the defendants' intentions on the night of the shooting was a far cry from the clear attempt to evoke fear and alarm among the *Mendiola* jurors, and the reference to gang fights was confined to her discussion of the natural and probable consequences of a gang-motivated assault.

Townley's further reliance on *People v. Vance* (2010) 188 Cal.App.4th 1182 and *United States v. Sanchez* (9th Cir. 2011) 659 F.3d 1252 is similarly misplaced. The prosecutor did not, as in *Vance*, urge the jurors to view the crime through the victim's eyes and imagine the victim's suffering, or comment derisively on either defendant's courtroom demeanor. Nor did she suggest in some version of the prosecutor's argument in *Sanchez*, that by convicting Townley they would " 'protect community values, preserve civil order, or deter future lawbreaking.' " (*United States v. Sanchez, supra*, 659 F.3d at p. 1256.)

### *(2) Racially Biased Remarks*

A prosecutor engages in misconduct if he or she refers to facts not in evidence, thereby " 'offering unsworn testimony not subject to cross-examination.' " (*People v. Hill* (1998) 17 Cal.4th 800, 828.) In *Hill* the prosecutor impugned the testimony of a defense witness who had witnessed the killing while visiting a friend whose last name was Hill.

---

[5]   The *Mendiola* prosecutor told the jury, "Now as I said, a lot of people are interested in your decision. . . . Everyone in Saipan is interested. That's why there are so many people in the courtroom. The people want to know if they are going to be forced to live with a murderer. [¶]  Your job is to worry about Mr. Mendiola. And when I say worry, I mean worry. Because that gun is still out there. [¶]  Mr. Mendiola deserves to be punished for what he did and that's your decision. And it's important because, as I said, that gun is still out there. If you say not guilty, he walks out right out the door, right behind you." (*Commonwealth v. Mendiola, supra*, 976 F.2d at p. 486.)

In an "outrageous fabrication," the prosecutor asked the jury to infer from the similarity of the names that the defendant and witness were related. (*Id*. at p. 829.) Townley contends that the prosecutor engaged in "almost identical" misconduct to that condemned in *Hill*, through remarks that were racially and ethnically biased.

The source of the challenged argument was the prosecutor's characterization of the perpetrators' "culture" and the suggestion that Townley was part of that culture. The prosecutor argued that Flores was scared to identify his companions. "He didn't want to dime people out. He didn't want to be a rat. Nobody wants to be a rat in that culture. In our culture we generally call it a Good Samaritan helping police solve a case. Different culture." Then, referring the jury to the "two different Spanish voices" that called out to the victim, the prosecutor commented that Townley "may or may not" speak Spanish, although Townley's girlfriend had testified that he did not know Spanish. The prosecutor also pointed out that "one of his sur names [*sic*] is Hernandez." She did not acknowledge Flores's testimony that he had never heard Townley speak Spanish.

Townley contends that the prosecutor engaged in misconduct by making the incorrect, racially biased suggestion that Townley spoke Spanish and implying that he was part of a culture that frustrates police investigation.[6] Our reading of the record, however, is more consonant with the People's interpretation. The prosecutor's reference to a "different culture" occurred in the context of her discussion of gang behavior,

---

[6] Susan Randolph had believed that all three were Hispanic. David Bacon saw only two of the assailants, who appeared to be of "Latino origin." Jeanne Taylor described the shortest of the three, the one with the black and red plaid jacket, as being of dark complexion. Ginger Weisel described the gunman as five feet nine inches, but she did not see any of their faces. They were yelling in English. Randi Fritts-Nash, one of the teenagers drinking at the apartment, described Townley as white, while the others were Hispanic. In her first interview at the station Oreb also described Townley as a "white guy." In the year that Noe Flores had known Townley, he had not heard Townley speak Spanish. Amanda Johnston, Townley's girlfriend, testified that Townley did not know Spanish.

including the resistance being a "snitch."  The prosecutor had already established during examination of Flores that he had not wanted to tell the police about what the group had done that night because he did not want to get them in trouble.  She repeatedly used the term "Good Samaritan" and elicited Flores's statement that he did not feel like a Good Samaritan by talking to the police.  We see no impermissible racial or ethnic insinuations in the challenged reference to being a "rat" on others.  At worst it was illogical, creating a false comparison between a "rat" and a Good Samaritan.  In addition, in further discussing Flores's reluctant testimony, the prosecutor clarified her associations by specifically referring to "the gang culture.  That's where this happened that night.  That particular culture."

As for the comment that Townley "may or may not" speak Spanish, the prosecutor's erroneous suggestion was not clearly deliberate.  Moreover, it was corrected by Townley's attorney, who pointed out that the prosecutor had incorrectly recalled or misunderstood the evidence.  He reminded the jury that two witnesses, not just one, had explained that Townley did not speak Spanish.[7]  This correction, together with the jury instruction to rely on the evidence rather than argument, dispelled any potential prejudice that conceivably could have resulted to *either* defendant from the prosecutor's misstatement.

### (3)  Misstating the Burden of Proof

Townley further challenges three statements the prosecutor made during her argument to the jury.  In her opening argument, she said, "I want to highlight a couple of things about Townley being the shooter.  I suspect most of you don't have much doubt in

---

[7] Townley's attorney noted that "there were two people.  Not just one.  Not just Amanda Johnston.  Noe Flores also testified, who's known Mr. Townley for over a year.  Mr. Townley didn't speak Spanish.  Mr. Flores did.  So there are actually two people that established Mr. Townley does not speak Spanish."

your mind about whether he is the shooter."[8]  We do not regard this comment as a claim that the prosecutor professed to have personal *knowledge* of Townley's guilt, so the People's response is not helpful.  Instead, Townley merely asserts that the prosecutor suggested she had a personal *belief* in his guilt and thus "lowered the burden to overcome doubt about this factual question."  We disagree.  The remark was brief and did not suggest that Townley had to refute her personal belief by presenting his own evidence.  Moreover, the defense objection to it was sustained.  The prosecutor then rephrased her comment to say, "Based on the evidence, all of the evidence you heard, the evidence doesn't support you[r] having a reasonable doubt as to whether . . . Townley was the shooter."

The prosecutor introduced her closing argument by revisiting the concept of reasonable doubt:  "[W]hat I want to tell you is [that] juries have worked with this for hundreds of years.  It's not super-esoteric.  It's a doubt to which you can assign a reason.  And the reason that's so important is because [*sic*] jury deliberations are a group activity.  You all will deliberate together.  And in order for you to be able to effectively do that, it can't be a feeling, because it's very difficult to put feelings into words so that all of you folks can talk about it.  So it has to be a reasonable doubt based on the evidence.  So remember, it isn't a feeling like I feel like maybe something's amiss.  It's something you can put your finger on and talk to your fellow jurors about."

Townley (joined by Carranco) contends that this argument misstated the law in the same manner that the Supreme Court condemned in *People v. Hill, supra*, 17 Cal.4th at page 831.  Reversal is not required, however.  First, neither of the defense attorneys objected to the prosecutor's statement, thus forfeiting the issue. Secondly, the challenged remark was not comparable to the argument rejected in *Hill*.  There, the prosecutor stated

---

[8] This comment has dubious relevance to Carranco's case, but as noted earlier, Carranco has joined wholesale in this section of Townley's brief.

37

that in order to have reasonable doubt, " 'you have to have a reason for this doubt. *There has to be some evidence on which to base a doubt*.' " (*Id*. at p. 831. ) The trial court clouded the picture further by not only overruling the defense attorney's objection, but also chastising him, thereby appearing to endorse the prosecutor's incorrect position and potentially biasing the jury against the defense. The prosecutor then continued: " 'There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.' (Italics added.)" (*Id*. at p. 831.)

Here the prosecutor did not affirmatively state that the defendant must have produced evidence to support a reasonable doubt; she said only that there must be a reasonable doubt based on the jurors' evaluation of the evidence presented. It is not reasonably likely that her statement would have been understood by the jury to mean that Townley had the burden of producing evidence to demonstrate a reasonable doubt of his guilt.

Later in her argument the prosecutor stated: "I want to remind you that the evidence doesn't have to eliminate any possible doubt. Just any reasonable doubt. That's all. That is all. There's always going to be possible doubts. But what an abiding conviction really is, what it boils down to, is it sits right in your gut. You feel okay, you feel good about the decision you made. Maybe some of you regret it later? Perhaps in a way. Perhaps some of you may feel badly about being involved in this trial. Something very violent happened to a nice guy. He was almost killed. Who wants to be a part of that? The Defendants are young. That is tragic. It's nothing short of tragic. But they made very adult decisions that night and, in fact, they made a very adult decision with somebody's life hanging in the balance. That is what they did that night."

Townley argues that these statements lowered the burden of proof by "equat[ing] abiding conviction to a moral certainty with something that the jury feels 'okay' about or 'good about the decision' even if '[m]aybe some of you regret it later.' " Again there was no objection by either attorney to the prosecutor's explanation. Townley misinterprets the

38

prosecutor's reference to regret; she was suggesting that some jurors might feel bad about convicting young people involved in a tragic event; yet they were making adult choices that almost cost an innocent person his life. Characterizing "abiding conviction" as a conviction that "sits right in your gut" is not equivalent to a mere hunch or "gut feeling." Thus, even if Townley had preserved this claim by a timely objection, we would find no basis for reversal. (Cf. *People v. Barnett* (1998) 17 Cal.4th 1044, 1156 [describing "beyond a reasonable doubt" as "that feeling, that conviction, that gut feeling that says yes, this man is guilty" was not a purported definition of "moral certainty" and did not cause a misunderstanding of the reasonable doubt instruction].) As in *Barnett*, the trial court's instructions, together with the correct statements of the standard by both defense counsel, mitigated any misstep in the prosecutor's characterization of the standard of proof and emphasized the burden placed on the prosecution to prove every element beyond a reasonable doubt. Hence, we find no reasonable likelihood either that the jury construed the prosecutor's remarks as requiring the defendant to carry any burden of proof or that the jury misapplied the relevant law.

### (4) *Misstating Facts*

Townley points to two instances he believes constituted misconduct by misstating facts. First, during opening argument the prosecutor was discussing Flores's declaration, and in particular his "mistake" about what he was wearing the night of the shooting. She stated, "When he was speaking with sheriff's deputies, they didn't make him any promises. They didn't tell him we'll cut you some slack if you come clean." The prosecutor went on to emphasize how reluctant Flores was to "come clean" and tell the officers what had happened. He did so, she pointed out, without distancing himself or minimizing his own role. She concluded, "There's nothing, nothing to suggest that he was doing anything but telling the truth that day. [¶] No promises from the D.A.'s office. He admitted that he understood what he had to do if he was called as a witness was to tell the truth. There's no evidence that he doesn't like these guys, that he'd want to set them

39

up for some reason.  Nothing.  He just met Carranco that night.  There was no suggestion that he had any ill-will toward Townley, so why would he?  Why would he set 'em up?  He didn't get anything out of it.  Again, deputies didn't promise him anything."

Townley again forfeited any challenge to this alleged misstatement by failing to object.  Were we to address the merits, we would reject the People's assertion that the prosecutor spoke accurately when she said Flores received no benefit from testifying.  Although his declaration contained the statement that he did not have "an agreement to testify in exchange for telling the truth in this declaration," it also reflected the plea deal he had made with the district attorney.  Nevertheless, the jury was fully aware of the negotiated disposition of Flores's case.  At trial Flores acknowledged that he had pleaded to a reduced charge, that he might be called to testify, and that if called he would have the obligation to tell the truth.

Townley also takes issue with the following statement by the prosecutor:  "When people talk about going to prison for life, they are talking about killing somebody."  The prosecutor was referring to Townley's statement to Fritts-Nash that he was "looking at 25 to life."  Townley contends that the comment "not only misstated the evidence, but . . . suggested that the prosecutor had evidence beyond the record to support her assertions."  The prosecutor's statement was an illogical inference from the facts and an incorrect statement of the law.  Nevertheless, defense counsel's objection was sustained, thus minimizing any harm.

### (5)  Sarcastic Remarks

Finally, Townley argues that the prosecutor made "a host of sarcastic comments in front of the jury," directed at defense witnesses as well as the attorneys.  "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel. [Citations.]" (*People v. Hill*, *supra*, 17 Cal.4th at p. 832; *People v. Vance*, *supra*, 188 Cal.App.4th at p. 1200.)  " ' "An attack on the defendant's attorney can be . . . seriously prejudicial as an attack on the defendant himself, and, in

40

view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable." ' [Citation.]" (*People v. Vance*, *supra*, 188 Cal.App.4th at p. 1200.)

Townley specifically focuses on two incidents. The defense had called Laurie Kaminski, an expert in gunshot residue, who had watched a video showing Townley rubbing his hands together and touching his shirt. Kaminski suggested that gunshot residue might be transferred from the shirt to his hands. She also expressed the opinion that it can be misleading to try to establish the meaning of gunshot residue based on its location, because particles "redistribute themselves." Thus, residue on someone's hands could result from being near a gun when fired, or from handling a fired gun or fired ammunition. In cross-examining Kaminski, the prosecutor asked what the odds would be of contamination ending with the right hand having significantly more particles than the left hand or sleeve. Kaminski explained that there would be no way to estimate those odds. The prosecutor suggested, "Sure a curious coincidence, wouldn't you say?" A defense objection, "argumentative," was sustained.

Even if this was an impermissible comment on the evidence, it was brief and insignificant, and in any event it was tempered by the ruling sustaining the objection. We find no harm from the offhand remark.

The second comment occurred during closing argument, when the prosecutor was going over Carranco's participation and Townley's admissions to Fritts-Nash after the shooting. The trial court overruled an objection by Carranco's counsel to the depiction of Carranco as saving face by getting out of the car with the other two assailants. At that point the prosecutor said, "If I'm lucky, I can be accused of misconduct one more time." This sarcastic remark was clearly gratuitous, but it had no bearing on the issues, and it only cast the prosecutor in an even more pejorative light, making her appear petty and querulous. And when Carranco's attorney asked the court to strike her remark, the prosecutor responded with yet more petulance: "Perhaps you should admonish Counsel as [*sic*] to stop objecting on that [misconduct] basis." The trial court appropriately

41

curbed such fractiousness by telling the prosecutor to "Just finish the argument." No prejudice to Townley or Carranco resulted from the prosecutor's intemperate but self-defeating conduct.

On the premise that misconduct occurred, Carranco further asserts prejudice to him, citing *People v Vance, supra,* 188 Cal.App.4th 1182.[9] In *Vance*, as in Carranco's case, the defendant did not deny all culpability; Vance admitted he was there, and he conceded that he was guilty of at least involuntary manslaughter. The critical issue instead was whether Vance had the mental state required for first degree murder. It was that issue that was colored by the prosecutor's misconduct. But prejudice arose from the jury's having been exposed to the prosecutor's "egregious" or otherwise "utterly improper" remarks, compounded by the trial judge's "passive," improperly tepid response. (*Id*. at pp. 1200, 1201.) None of the objectionable remarks by the prosecutor here rose to a level comparable to what had occurred in *Vance*; consequently, we cannot agree that the jury's decision regarding Carranco's mental state was influenced adversely to Carranco by the prosecutor's conduct during trial.

*4. Trial Court's Comment on Flores's Credibility*

During cross-examination of Flores and later in closing argument, defense counsel suggested that Flores had merely assented to the detectives' leading questions without independently recalling facts. In cross-examining Flores, counsel for both defendants brought out Flores's initial denial to the police that he had witnessed anything, along with questions apparently designed to suggest that (a) Flores was manipulated into admitting his participation in the crime and (b) Flores's plea bargain was an incentive for testifying

---

[9] We briefly address this assertion although it is outside the scope of the Supreme Court's remand. (See Cal. Rules of Court, rule 8.200(b)(2).)

against Townley and Carranco.[10]  The following colloquy took place in cross-examination by Carranco's attorney:  "Q.  And early on when you're talking to Detective Ramsey, you initially told him several times that you didn't know anything about this; is that correct?"  After the prosecutor's objection was overruled, Flores answered "Yes" and counsel continued:  "And Detective Ramsey, during that interview, conveyed to you that they already had some information about this situation; is that correct?  [¶]  A. Yes.  [¶]  Q. Detective Ramsey also told you he didn't believe your statement that you didn't know anything about this situation; is that correct?  [¶]  A. Yes.  [¶]  Q. Detective Ramsey at one point called you a stand-up guy; is that correct?  [¶]  [The prosecutor]:  Your Honor, objection.  Hearsay.  It exceeds --  [¶]  THE COURT:  It's all irrelevant.  Sustained."  When Carranco's attorney tried to defend his question as relevant to Flores's state of mind, the court responded with the explanation challenged on appeal:  "We've already established by everyone's agreement that whatever – most of what he told Detective Ramsey wasn't the truth, and that he told what he thinks characterizes the truth to Sergeant Sulay later in the interview.  That's my understanding of the testimony in this case.  I don't know where you're going with characterization and police tactics used by Detective Ramsey.  And those aren't actually that relevant."

Shortly thereafter, Carranco's attorney brought out Flores's acknowledgement that in the interrogation room he was nervous and scared and afraid of being locked up.  The next question-- "And you asked detectives if you were going to be able to go home; is that correct?"—prompted an objection by the prosecutor on relevance grounds.  Counsel responded, "Goes to the credibility of the statement that he's making."  But the court disagreed, explaining that "[t]he credibility is what he's saying today, not what he said

---

[10] For example, Townley's attorney asked, "You indicated to Deputy Ramsey when you were initially talking to him you hadn't seen anything; is that correct?  [¶]  A. Yes. . . . [¶]  Q. You hadn't witnessed – the way you used – 'I witnessed nothing'; is that correct? [¶]  A. Yes.  [¶]  Q. You took the position, I didn't know what happened.  [¶]  A. Yes."

back when he was interviewed. You all have to use his interview for impeachment of different purposes, but the jury has to focus on whether his testimony today is truthful or not, and on the other indications here that they've heard."

Carranco again joins in Townley's argument that these rulings violated his Sixth Amendment rights to present a defense and cross-examine witnesses, because the court improperly commented on the evidence and "cut-off [*sic*] reasonable attempts to demonstrate that [Flores's] testimony was the product of threats and promises of leniency." We reject this contention, as we find no impairment of either defendant's constitutional rights. The court was not declaring the police tactics irrelevant to Flores's credibility at trial; it was merely observing that it had already been established that Flores had not told the truth to the deputies when first interviewed. The colloquy did not significantly add to the jury's understanding of the defense position.

The issue presented by Townley in this case is not comparable to the decisions on which he relies. Townley cites only one part of the holding in *Crane v. Kentucky* (1986) 476 U.S. 683 (106 S.Ct. 2142), where the Supreme Court explained that the right to a fair trial was violated by the "blanket exclusion" of testimony about the circumstances of the defendant's confession. (*Id.* at p. 690.) The high court cited its earlier decision in which it had explained that while " 'the exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination,' " a defendant is not entitled to " 'cross- examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678-679 [106 S.Ct. 1431].) Accordingly, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only marginally relevant." (*Id.* at p. 679.) *California v. Green* (1970) 399 U.S. 149, 158 also is not helpful to Townley; the cited holding merely confirms that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is

44

testifying as a witness and subject to full and effective cross-examination." *People v. Fierro* (1991) 1 Cal.4th 173, 221 only offers the reminder that a prior inconsistent statement is admissible "not only to impeach credibility but also to prove the truth of the matters stated." And *People v. Rodriguez* (1986) 42 Cal.3d 730, 772 is inapposite because it addressed judicial comments to a deadlocked jury; indeed, the court emphasized that "accurate, temperate, nonargumentative, and scrupulously fair" commentary is not tantamount to coercing the deadlocked jurors into reaching a verdict. (*Id*. at p. 766.) "Accordingly, we have made clear that the trial court has broad latitude in fair commentary, so long as it does not effectively control the verdict. For example, it is settled that the court need not confine itself to neutral, bland, and colorless summaries, but may focus critically on particular evidence, expressing views about its persuasiveness." (*Id*. at p. 768.) The court in this case did not even go that far; not only were the coercive circumstances of a deadlocked jury absent here, but there was no comment beyond pointing out a fact that had already been established.

Nor is this case analogous to *People v. Sturm* (2006) 37 Cal.4th 1218. There the trial judge's comments during the penalty phase of trial told the jury that the defendant had been convicted of premeditated murder, which was not true. That inaccurate statement not only advanced the prosecutor's argument that the defendant had premeditated the murders, but "severely damaged" the defense position that lack of premeditation and deliberation was a mitigating factor in the penalty decision. (*Id*. at p. 1232.) No such damage occurred here. The court's statement was accurate in that Flores's credibility on the witness stand was the critical point the jury had to determine. If his trial testimony was false, defense counsel could use the circumstances of his prior statement for impeachment; and Townley's attorney did so by bringing out the details of Flores's plea agreement with the prosecution. Defense counsel also stated in closing argument that Flores tended to agree with any suggestion made to him about the facts. The court acted to control the proceedings and minimize jury confusion by limiting

45

Carranco's cross-examination to testimony bearing on Flores's credibility at trial, curtailing his cross-examination on the veracity of the statements made to Detective Sulay. Neither Townley nor Carranco was deprived of a fair trial by the trial court's ruling. Furthermore, any potential jury misunderstanding would have been averted or corrected in the instruction with CALCRIM No. 318, which told the jurors that they could use the prior statement to evaluate whether Flores's trial testimony was true and whether his statements to the detectives were true.

## Conclusion

On the record before us we are unable to discern a reasonable probability that, but for the interference with defense counsel's ability to discuss Flores's declaration with Carranco, the outcome of trial would have been different. (*Strickland*, *supra*, 466 U.S. at p. 694.) Whether additional evidence of prejudice exists outside the appellate record is not a question we can answer in this procedural posture. We further cannot find ground for reversal in the prosecutor's intemperate conduct during trial, the court's evidentiary exclusions, or the trial court's reference to a witness's credibility.

## Disposition

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.